THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY PURNELL, Defendant-Appellant.

First District (5th Division)   No. 83—2775

Opinion filed December 7, 1984.

Steven Clark and Scott Graham, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Cuomo, and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:
Following a bench trial, defendant was found guilty of rape, devi-

ate sexual assault, unlawful restraint, home invasion, residential burglary and armed violence and was sentenced to an extended prison term of 50 years on the rape offense only (Ill. Rev. Stat. 1981, ch. 38, par. 11—1), the trial court having found that the other offenses merged with the rape offense.

On appeal to this court, defendant contends that: "(1) defendant's Sixth Amendment right to counsel was violated where he was placed in a lineup without notice to appointed counsel; (2) defendant was denied due process of law and a fair trial where the trial court allowed his impeachment with four prior convictions without exercising its discretion in determining their admissibility as required under *People v. Montgomery* (1971), 47 Ill. 2d 510; [and] (3) defendant was denied a fair trial where the trial court admitted evidence of [the] complainant's identification from a photographic array where the prosecution failed to produce the photographs. This error prevented defendant from establishing that the photographic procedure was unduly suggestive and rendered [the] complainant's identification testimony unreliable." We affirm.

The complainant testified that at approximately 1 p.m. on January 10, 1982, she entered the hallway of her apartment building and walked up the stairs to the first floor, where she saw defendant descending the stairs from the second floor. The defendant walked past the complainant to a fire-escape door, then turned and walked back to her. The complainant testified that defendant displayed a gun and said, "Don't scream and I won't hurt you. Open the [apartment] door and go inside." They entered the complainant's apartment and defendant asked her why she lived alone, to which she answered, "Because there was no one to live with me." Defendant then pointed the gun at the complainant's head, told her to kiss him and began to unbutton her coat and clothing, while holding the gun in his left hand. Defendant told the complainant to sit in a chair, to unfasten his pants and perform oral copulation on him. She did so, whereupon he told her "to get up and go to the washroom and clean up," which she did, with the defendant following behind.

Defendant then told the complainant to lie down on the living room floor. Defendant went into the kitchen, took a wallet that was on top of the refrigerator and returned to the living room where the complainant was still lying on the floor. Defendant asked the complainant how long she had lived in the apartment, whether she had a job and how she paid her rent. The complainant remained on the floor nude as she answered his questions. During this conversation, the janitor of the building unexpectedly opened the front door of the apart-

ment and looked into the living room. The complainant screamed "No!" The janitor said "Oops!" and walked out. The defendant asked the complainant why the janitor had come and the complainant explained that he probably came to exterminate her apartment. Defendant then ordered the complainant to spread her legs so he could have sex with her, and he did. After a few moments, the defendant went into the kitchen, wiped himself off with a towel and told the complainant that he was going to shoot her. The complainant pleaded for her life. Defendant ordered the complainant to get dressed. She again began to cry and told the defendant that she was glad he did not kill her. The defendant then left her apartment.

The complainant further testified that after the defendant left she started to pack her clothes, that someone rang the buzzer to her apartment and that she was afraid to answer the door. Soon thereafter she heard her mother's voice at the door and the complainant let her in. She told her mother that she had just been raped. The complainant's mother called the police, who came and drove the complainant to the hospital. Eight days after the incident the complainant identified defendant from police photographs.

Cross-examination of the complainant disclosed that the defendant remained in the apartment for approximately 30 minutes, that the complainant's description of the assailant given by her to the police was: black, approximately 170 pounds, moustache, and that he was taller than the complainant.

Detective Hans Heitmann, the State's next witness, testified that he conducted a lineup which included the defendant and which was viewed by the complainant. Heitmann identified a photograph of the lineup, State's exhibit No. 1, and stated that the complainant identified defendant in the lineup. Under cross-examination, Heitmann testified that he did not show photographs of the defendant to the complainant. He also stated that "[t]hey [the pictures] were first mentioned today. I have no knowledge of any photographs prior to today." Under further cross-examination, Heitmann stated that the complainant identified the defendant the moment she stepped to the window and looked out.

It was stipulated that the janitor, Robert Alvardo, would testify that when he opened the door to the complainant's apartment he observed the complainant crying on the floor and a black male sitting in a wicker chair and that when he left the complainant's apartment he called the complainant's mother. It was further stipulated that Joan Taylor, the complainant's mother, received a telephone call, that she went to her daughter's apartment and that when she arrived the com-

plainant told her that she had been raped. The stipulated medical examination of the complainant proved positive for vaginal sperm.

Defendant called Officer Raymond Behnke, who testified that he talked to the complainant in her apartment on the day of the incident and that she gave him the following description of her assailant: late twenties, dark complected, moustache and, as Behnke estimated based on the complainant's description, five feet, four inches tall and 170 pounds.

Testifying in his own defense, defendant stated that he was not in the complainant's apartment on the day of the incident. He further stated that while in custody at the police station he participated in a lineup, that he was asked by an officer to wear in the lineup the burgundy and white jacket he had on when he was arrested and that pictures were taken of the lineup. Defendant also testified that on the day following his arrest, while in custody at the police station but before he participated in the lineup, a policeman took his picture, at which time he had on the burgundy and white jacket that he was wearing at the time of his arrest.

Cross- and redirect examination of the defendant disclosed that at the time of his arrest defendant resided at 4224 North Ashland, that his height was 5'10", that he was 28 years old, was not married and that he was not working on the day of the incident. At the close of this testimony defendant rested.

Defendant then made a motion to suppress the complainant's in-court identification testimony on the grounds that it was improper for the police to have the defendant appear in a lineup wearing the same clothing (burgundy and white jacket) that he wore in the photograph which was previously shown the complainant. The complainant selected this photograph of the defendant from an array of others prior to her lineup identification of the defendant. Defendant further argued that the pictures shown the complainant should have been "produce[d] in open court, during pretrial examination, or at trial." Additionally, he argued that because his attorney was not notified that he (defendant) would appear in a lineup, the complainant's identification of the defendant was "impermissible, suggestive and therefore tainted."

The trial judge denied defendant's motion to suppress the complainant's in-court identification on the grounds that "there is not enough here to suggest that there was suggestiveness." It was then stipulated that defendant had seven felony convictions, four of which occurred within the past 10 years. Those four convictions were theft, attempted murder, armed robbery and aggravated battery. The trial

court stated that the complainant was a very credible witness who "had over an hour, in the middle of the daytime to view her assailant," and that the complainant was corroborated by (1) the janitor's stipulated testimony that he opened the complainant's apartment door and saw her nude and crying on the floor; (2) her prompt rape outcry to her mother; and (3) the stipulation of the microbiologist that the complainant's vaginal tests were positive for sperm.

The trial court further determined that the complainant's ability to describe the defendant was "relatively accurate," that the complainant's description of the defendant as 190 pounds, moustache and maroon and gray jacket were accurate, and that the defendant admitted that he owned and wore "that jacket" on the day he was arrested.

The record in the case at bar reveals that the defendant was brought before the court on a series of charges for which the court appointed a public defender to represent him. These series of charges did not include the instant offenses. The preliminary hearing on these series of charges was continued, and the defendant was returned to the lockup. Police officers subsequently removed the defendant from the lockup and placed him in a lineup to be viewed by the complainant for the instant offenses. Defendant contends that this was done without notice to his court-appointed counsel and without admonition to him of his right to counsel at the lineup in violation of his sixth amendment right to counsel. The State responds that the defendant's court-appointed attorney was not appointed to represent the defendant for the offenses for which the defendant was placed in the lineup, i.e., the instant case, that the defendant had not yet been charged with commission of the instant offenses at the time he was placed in the lineup, and that adversarial proceedings in the instant offenses thus had not been initiated. Furthermore, the State contends, defendant was advised of his right to counsel at the lineup, but he knowingly waived this right.

The record shows that Detective Heitmann, who was called by the defendant on his motion to suppress the complainant's identification evidence, testified as follows:

"Q. Detective Heitmann, was Mr. Purnell asked to participate in this lineup?

A. Yes.

Q. And did he voluntarily consent to do so?

A. *Well, prior to being asked I advised him of his rights and I asked him after I advised him of these rights I would like him to stand in the lineup and he said I have no objection to it.*

Q. Is it not true Mr. Purnell was there [for] a preliminary hearing in another matter?

A. I believe he was there on another matter. *** I knew he was there locked up for that purpose, yes.

Q. Did Mr. Purnell have an attorney present at this lineup?

A. No, he did not.

Q. Are you aware he did in fact have a public defender?

A. I am not aware of it. *He didn't tell me he wanted anybody there after I told him his rights.*

Q. *He was in fact advised of the fact that an attorney could be present during his lineup?*

A. *As part of his constitutional rights, yes.*" (Emphasis added.)

The defendant's contrary testimony under cross-examination, presented at the identification suppression hearing, was as follows:

"Q. Mr. Purnell, the detective that you just testified about do you remember talking to him on the 18th of January?

A. I didn't talk to him at all. He wasn't inside the room at all.

Q. You don't remember having him advise you of your rights?

A. No.

Q. Do you remember any officer advising you of your rights?

A. No.

Q. They just put you in a lineup?

A. Yes."

■ From this conflicting testimony between Heitmann and the defendant, the trial court accepted the testimony of Heitmann and held that the defendant waived his right to counsel at the lineup, stating, "[T]here has been no showing that Mr. Purnell asked for his attorney to be present. And in fact the police testified to the contrary." It was within the trial court's province to resolve the foregoing conflicting evidence. (*People v. Rosa* (1981), 93 Ill. App. 3d 1010, 418 N.E.2d 124.) Based on our review of the record, the trial court's decision was not unreasonable and was supported by the evidence. Therefore, it will not be disturbed. Accordingly, we need not decide the applicability of the cases on which defendant relies as authority for his contention that he had a constitutional right to counsel at the lineup (*People v. Adams* (1983), 116 Ill. App. 3d 315, 451 N.E.2d 1351; *People v. Sharp* (1983), 150 Cal. App. 3d 13, 197 Cal. Rptr. 436), nor need we discuss or decide the State's inconstant argument under *Peo-*

*ple v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017; *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228; *People v. Hall* (1983), 117 Ill. App. 3d 788, 453 N.E.2d 1327; *People v. Sanderlin* (1982), 105 Ill. App. 3d 811, 434 N.E.2d 1158; and *People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1, that the defendant was not constitutionally entitled to counsel at the lineup for the then nonadversarial (instant) offenses for which his lawyer had not yet been appointed to represent him.

■ Defendant's second contention must also fail. He argues that the trial court failed to exercise its discretion under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, and exclude evidence of defendant's four prior felony convictions of attempted murder, armed robbery and aggravated battery in 1975, felony theft in 1980 and attempted burglary in 1983. After hearing defendant's argument on the prejudicial effect of his prior convictions, the trial court ruled:

"I have followed *Montgomery* for both witnesses and defendants. I have excluded in the past those convictions that are without the ten year limitation, and I have included misdemeanors that go to basic honesty, chief challenges, such as that. I have applied [the] *Montgomery* decision to both defendants and witnesses as I have said before, so I will allow your motion *in limine* for any conviction that is more than ten years from today, and for any misdemeanors. If there are any others that fall within *Montgomery*, your motion *in limine* is denied. I exercise my discretion. I know I have discretion. I exercise my discretion by allowing that."

Defendant argues from the foregoing that the trial court did not exercise discretion but, instead, applied a "blanket rule" of allowing impeachment by admission of convictions which occurred within 10 years of trial and excluding convictions falling outside that period.

In *Montgomery*, our supreme court stated that:

"Both the American Law Institute and the Commissioners on Uniform State Laws have taken the position that when the accused takes the stand on his own behalf he should be subject to impeachment only by proof of past crimes which directly bear on testimonial deception *** and that past convictions not in this category should not be admissible unless they are relevant for some purpose other than impeachment. More recently, the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States has approved the following rule relating to this problem:

'Rule 609. Impeachment by Evidence of Conviction of Crime

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime *** is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date.'

* * *

' "In exercising discretion in this respect, a number of factors might be relevant, such as the nature of the prior crimes, *** the length of the criminal record, the age and circumstances of the defendant, and above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction." Chief Justice Burger suggested in [*Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936] various factors to be considered in making the determination: the nature of the crime, nearness or remoteness, the subsequent career of the person, and whether the crime was similar to the one charged.' " *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 518.

In the pending case, we do not agree with the defendant's contention that the trial court applied a "blanket rule" of admitting all felonies less than 10 years old for impeachment purposes. As the trial court's previously quoted excerpt shows, the court was well aware of the factors to be considered in determining the admissibility of defendant's convictions. In fact, the trial judge pronounced, "I have included misdemeanors that go to basic honesty, chief challenges, such as that." The record does not reveal any statement by the trial judge which establishes that he did not properly exercise his discretion under *Montgomery* in admitting the defendant's prior convictions. Moreover, there is no requirement that the trial judge make an express evaluation of each of the *Montgomery* factors in open court in balancing the probativeness of prior convictions versus their prejudicial effect. A reviewing court will assume that the trial judge gave appropri-

ate consideration to only relevant factors. (*People v. Washington* (1973), 55 Ill. 2d 521, 523-24, 304 N.E.2d 276; *People v. Fought* (1980), 85 Ill. App. 3d 732, 733, 407 N.E.2d 231.) In our view, the trial court did not abuse or improperly exercise its discretion.

■ Defendant further argues that he "was denied a fair trial where the trial court admitted evidence of [the] complainant's identification from a photograph array where the prosecutor failed to produce the photographs [which] error prevented defendant from establishing that the photographic procedure was unduly suggestive and rendered complainant's identification testimony unreliable." This argument is unpersuasive.

First, the trial court was fully apprised of the facts surrounding the absence and loss of the pictures and was advised by the State that the failure to provide the defendant with the pictures was inadvertent and that prior to trial a trial assistant had diligently attempted to find the pictures after he discovered they were missing. Second, the complainant testified that the photos were of several different men, that no one told her which picture to select and that after viewing the pictures and selecting defendant from among them she again selected defendant as her assailant from a lineup that was conducted shortly thereafter. The trial court was fully aware of the pertinent facts of the complainant's photo identification and reasoned as follows:

"THE COURT: Okay, I went back and looked at my notes concerning Miss Rochelle Jones' testimony as to seeing the photographs. *She said she picked out Purnell's picture from a group of pictures and she did not say all the pictures were of Purnell. Nobody cross examined or brought to me any evidence those were only pictures of Mr. Purnell. From her statement I think I can reasonably infer the pictures that were shown to her were a group of pictures one of which was Purnell. There is no evidence to the contrary.* Bringing Mr. Purnell into a hallway and having him stand there and parading the five individuals one by one up to the glass and then back and having them stand in a line and have photographs taken after the lineup certainly doesn't appear to be in any way suggestive. I have in front of me the lineup photograph. All five of the gentlemen appear to be of the same general height. Two are a little thinner but the other three—or the other two are approximately the same build as Mr. Purnell. They all have facial hair, moustaches. Three of them along with Mr. Purnell seem to have both moustache[s] and chin whiskers. One has a beard. All are approximately the same height. It appears to be they all have

approximately the same complexion. It appears to be on its face a relatively fair type of showing. Miss Jones did testify specifically nobody advised her who to pick out. [They] only told her they believed they had the man in custody and asked if she could come— they think they have a man in custody who matches the description she gave them, at least as to the clothing.

Other than that there does not appear in my mind to be any impropriety." (Emphasis added.)

For the reasons set forth above by the trial court, we do not believe that the defendant was denied a fair trial or that the complainant's pre-trial photograph identification of the defendant was impermissible or suggestive. *People v. Son* (1982), 111 Ill. App. 3d 273, 278, 443 N.E.2d 1115; *People v. Chancy* (1980), 91 Ill. App. 3d 817, 820, 414 N.E.2d 1239.

Accordingly, the trial court's judgment and sentence imposed thereon will be affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.