THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM NEGRON, Defendant-Appellant.

First District (3rd Division)   No. 1—96—0725

Opinion filed June 17, 1998.

Thomas S. O'Neill and Seth A. Travis, both of Jenner & Block, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

## NATURE OF THE CASE

Following a three-day joint trial in the circuit court of Cook County, a jury found defendant, William Negron, and his codefendant, Roberto Almodovar, guilty of the first-degree murders (720 ILCS 5/9—

1(a)(1) (West 1992)) of Amy Merkes and Jorge Rodriguez, the attempted first-degree murders (720 ILCS 5/8—4, 9—1 (West 1992)) of Kennelly Saez and Jackie Grande, and aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1992)) of Jackie Grande. Defendant was sentenced to natural life in prison at the Illinois Department of Corrections (IDOC) for the two counts of murder, and 30 years' imprisonment at IDOC for the two counts of attempted murder, sentences to run consecutively. Defendant appeals, arguing that (1) the eyewitness identifications of defendant were as a matter of law insufficient to prove him guilty beyond a reasonable doubt; (2) the State's motive evidence should have been excluded; (3) defendant received ineffective assistance of counsel; and (4) the State failed to produce *Brady* material. For the reasons given below, we affirm.

## FACTS

In September 1994, defendant and codefendant were jointly charged by an indictment in 11 counts. Each was charged with four counts of first-degree murder (two counts for each of the two victims) (720 ILCS 5/9—1(a)(1), (a)(2) (West 1992)), two counts of attempted first-degree murder (720 ILCS 5/8—4, 9—1 (West 1992)), two counts of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 1992)), two counts of aggravated battery (720 ILCS 5/12—4(a) (West 1992)), and one count of aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1992)). In November 1995, during pretrial proceedings, the State nol-prossed the two counts of aggravated battery and the two counts of aggravated discharge of a firearm with respect to both defendants. The case proceeded to a joint trial on the remaining seven counts.

The State's first two witnesses at trial were the mothers of the decedents. Each testified to having seen her child alive the evening before the incident and identified a photograph as depicting her son or daughter as she had last seen him or her. Each testified that her child had gone out on the evening of August 31, 1994, and had not returned home.

The State's third witness was Deputy Medical Examiner Dr. Thamrong Chira. After qualifying Dr. Chira as an expert in forensic pathology, the State inquired about the manner of death of the two victims in this case, on both of whom Dr. Chira had performed autopsies. He testified that both Amy Merkes and Jorge Rodriguez had died from single gunshot wounds. In each case the bullet had entered the victim's back, but Dr. Chira was not willing necessarily to conclude the victims had been facing away from the shooter because of the possibility of a ricochet. Neither had been shot at close range. In Dr. Chira's opinion,

the cause of death was homicide in each case. Dr. Chira testified that the victim Merkes was wearing a blue sweatshirt, black sweatpants, and black and blue sneakers when she arrived.

Fourth, the State called Kennelly Saez. Saez testified that as of September 1, 1994, the date of the murders, he had been a member of a street gang, the JOD's (also referred to at trial as the Young Latin Organization of Disciples, or simply Disciples), for about a year and a half. He testified that the JOD's, whose gang colors were blue and black, were at war over territory with another gang, the Insane Dragons. The Insane Dragons were attempting to expand their territory to take over Cortland Avenue in Chicago. Saez testified that he was unaware of any killings involving the Insane Dragons and the JOD's shortly before September 1994.

On September 1, 1994, the date of the shooting, Saez was living at 3918 West Cortland, in an area of the street in which the Insane Dragons were attempting to establish themselves. From 10 or 11 p.m. earlier that evening until the time of the shooting after midnight, he was out in front of his house with Jackie Grande and the decedents, Jorge Rodriguez and Amy Merkes. Saez was standing and the other three were sitting on the step outside the door at the front of his building. He estimated his doorway was between 8 and 10 feet from the curb.

At about 1 a.m., the group saw a blue Oldsmobile drive down Cortland twice. After the car went by the second time it turned into an alley at the end of the block, sat still for a few seconds, then pulled out and drove back towards the group in reverse. It stopped at a gap between two parked cars, roughly parallel with the doorway to the building. Saez was able to see the driver and rear passenger portion of the car from where he was standing. He described the area in front of his building as very open, with only a few trees in the area and lights in front of and above his doorway. The car was facing east on Cortland and 3918 Cortland is on the north side of the street. Cortland is a two-way street, but the car was on the north (wrong) side of the street when it reversed and stopped.

When the car stopped Saez walked towards it, stopping at the sidewalk. The driver's window was down, and the rear window was halfway down. There were three persons in the car. Saez was able to see the driver and rear seat passenger, whom he later identified as defendant Negron and codefendant Almodovar, respectively. He had not previously known either person, but had no trouble seeing their faces. When Saez looked into the car, codefendant said "what's up, folks," which Saez understood to be a greeting indicating that he was part of Saez's general gang organization. When Saez responded "who's that,"

codefendant pulled a gun and pointed it at him. Saez dropped to the ground, and as he did so, he heard a number of shots. Shortly thereafter he heard the car skid away.

When Saez looked and saw the car driving away, he ran toward the entryway to his building. It was there that he saw the victim Merkes lying on the ground, bleeding. He ran upstairs and saw Grande and Rodriguez, both of whom had also been shot. Saez called 911 and ran back downstairs to check on Merkes. She was not moving. When the police arrived, Saez went with them to tell them what had happened.

Approximately a week later the police called him in to view a lineup at the Area Five Violent Crimes police headquarters. Grande, who had survived the shooting, was also present at Area Five at that time. Saez viewed the lineup first and picked defendant Negron and codefendant Almodovar as the driver and shooter, respectively. Saez stated that the detective conducting the lineup did not at any time tell him who to pick out. After viewing the lineup Saez left the lineup room, having no contact with Grande before she went in to view the lineup.

Saez admitted that some time after the lineup, in March 1995, he went to the office of attorney Melinda Power at the instructions of his gang leader, Ki Ki, and signed a paper. On cross-examination it was established that the paper Saez signed was a sworn affidavit to the effect that he was high on marijuana at the time of the shooting and was not able to see the faces of the persons in the car. Saez testified that he lied in the affidavit, that the reason he said the things he did at that time was that he was afraid his gang would give him a "violation"—a three- to four-minute group beating—if he did not do so.

On cross-examination Saez admitted that a number of gangs were known collectively as "folks," including the Latin Disciples, Insane Dragons, Unknowns, and Latin Kings, among others. Saez admitted that when he talked with the police on September 1 he told them that he thought the persons in the car might have been Latin Kings. He admitted that he did not know either of the defendants, had never seen either of them before September 1, and did not know them to be Insane Dragons. He was not aware of anyone in his gang shooting any Insane Dragons before September 1, and he told the police that he did not know why he was shot at. He admitted that his gang was at war with the Insane Dragons and that gangs at war sometimes retaliated against each other. He denied awareness that Carlos Olon had been killed by Insane Dragons two days before the shooting.

Saez admitted that there were no streetlights on the north side of Cortland and there were no lights inside the car. However, he

maintained that the light above his doorway was very bright, and he was perfectly able to see the occupants of the car. He stated that the windows of the car were not tinted. He admitted that the only description he gave the police of the occupants of the car was "three male [L]atinos"; he did not mention height, hair length, or other distinguishing factors.

Saez further admitted that he had been convicted of robbery, he was currently in jail for violation of probation for the robbery, and his case was due to be heard within the same week as the instant trial. Saez further admitted that he had not on his own initiative advised the police or the State's Attorney that he was being coerced by his own gang to provide a false affidavit to attorney Powers. He admitted that the first time he told anyone about any such alleged coercion was when an assistant State's Attorney and investigator came to see him in jail.

However, on redirect Saez stated that when Powers had first come to see him to elicit a statement he had refused to speak with her. Later, however, his gang leaders told him he would receive a "violation" if he did not give her a statement, and she "showed up at [his] door" shortly thereafter. At this time he agreed to speak with her and set up the meeting at her office, where his affidavit was typed. He stated that Ki Ki was present in attorney Powers's office when he gave her his statement and was telling him what to say. Powers typed the statement while she was asking him questions and he was telling her what Ki Ki told him to say. Contrary to his affidavit, Saez denied that he had smoked marijuana on September 1 and that he was unable to see and discern the offenders in the vehicle. Saez explained that the reason he had not told anyone about his false statement before the assistant State's Attorney came to see him in jail was fear of a "violation."

The State's next witness was Chicago police officer Robert Lohman. Officer Lohman was the first member of the police force to arrive at the scene after the shooting on September 1. He stated that he was on routine patrol in his squad car with his partner at about 12:45 a.m. when a citizen, Juan Velez, came up to them and told them about the shooting. They activated their lights and proceeded to the scene. Officer Lohman stated that there were two streetlights fairly near the scene, one at each end of the block, in addition to the light above the entrance to the building which he estimated was 20 feet from the curb. He had no difficulty making any observations or seeing what was going on at the scene. He testified that at the time he arrived there were cars parked along the curb, but there was an approximately four-foot gap immediately in front of the door.

The State's next witness was Chicago police officer John Butler, an evidence technician. Officer Butler testified that the lighting conditions were very good when he arrived on the scene at 3918 Cortland at approximately 1:45 a.m. He had no difficulty seeing people and things. Butler testified on direct that there was a streetlight on Cortland directly across from the scene, but on cross-examination admitted that he saw no such light in any of the photographs of the scene with which defense counsel confronted him.

Jackueline Grande testified next for the State. She basically corroborated Saez's version of events. She testified that she and Merkes had gone to see Saez on the evening in question. After they arrived they all sat outside the front door of Saez's apartment building on Cortland. At approximately 12:45, a car drove past them heading west on Cortland, then shortly thereafter drove back east on Cortland, turned into an alley, paused, then reversed toward them and stopped parallel to them. Grande identified defendant as the driver and codefendant as the rear seat passenger. She testified that she had no difficulty seeing their faces at the time of the incident. Once the car had reversed and stopped, the occupants of the car and the people on the stoop sat looking at each other for a few seconds. She was able to see both the driver and the rear seat passenger; she did not remember noticing that the windows were tinted.

According to Grande, either the driver or the rear passenger then said "what's up, folks," and Saez took a few steps toward the car. Grande testified that Rodriguez (not Saez) said "who's that," after which the rear passenger pulled out a gun and started shooting. When the shooting started the three victims who were still near the door, Rodriguez, Grande, and Merkes, tried to run inside the building. As they were doing so, all three were hit. As she looked back toward the car Grande saw two flashes, one where the rear seat passenger was sitting and another one coming from outside the car. She believed that two people were shooting.

After the incident was over, Grande was taken to a hospital and treated for her gunshot wound. On September 5, shortly after Grande was released, Detective Guevara came to her house and showed her pictures of 12 different men, 6 with long hair and 6 with short hair. She picked defendant and codefendant out of the photo arrays. One week later, on September 12, Grande viewed a lineup and again picked out defendant and codefendant. She stated that Saez was also at the police station, but they viewed the lineup separately and did not speak to each other between their viewings.

On cross-examination Grande stated that she had spoken with two detectives while she was in the hospital but had been unable to de-

scribe the back seat passenger as anything other than being light skinned, with a long thin face and long curly hair. She admitted that she had been shot in the back and that during the incident she had been trying to get away as quickly as possible.

The State's next witness was Detective John McMurray of the Chicago police department. Detective McMurray testified that in June 1995 in the course of an unrelated investigation he went to the apartment of Leandro Marin. In Marin's apartment he saw an open envelope that contained two complete sets of Chicago police department supplementary reports, one pertaining to the murders of Merkes and Rodriguez, and the other, the homicide of Carlos Olon.

Next the State called Chicago police detective Renaldo Guevara. Detective Guevara was in charge of the investigation into the Merkes and Rodriguez murders. He was also involved in the investigation of the murder of Carlos Olon, which occurred two days prior to the homicide in this case. Guevara knew Olon to have been an Insane Dragon; he was killed approximately seven blocks from the scene of the crime in this case.

As was previously testified to by Grande, Guevara presented Grande with a photo array on September 5. He confirmed that Grande picked the photo of codefendant as the rear seat shooter and the photo of defendant as the driver, who, according to Grande, was also shooting. Guevara subsequently arrested both defendants and brought them to Area Five for the lineup on September 12. He corroborated that both Saez and Grande independently picked both defendant and codefendant out of the lineup without hesitation.

On cross-examination the detective testified that although he had shown the photos to Grande on September 5, he had never shown them to Saez. Guevara stated that he had tried to contact Saez to show him a photo array, but had difficulty reaching him, despite having his phone number and address. He admitted that, at the time of his arrest, defendant was driving a different car than the one involved in the crime.

After Detective Guevara's testimony, the State offered its exhibits and rested. Defendants objected to State's exhibit 26, which was the envelope of police reports that Detective McMurray found in the apartment of Marin. The court ruled that the envelope would be admitted into evidence but would not go to the jury.

In presenting his case defendant's only witness was Juan Velez. Velez, a Cook County deputy sheriff, testified that he was driving eastbound on Cortland at approximately 12:45 a.m. on September 1. As he proceeded east after stopping at a stop sign at Harding (the street just west of where the shooting occurred), he noticed that a car

that had been heading westbound made a "U"-turn in the intersection and began following him. When he turned south into an alley just east of Cortland, the car also turned in. Velez got out of his car and looked at the car; there was no license plate and he could not see the driver or any passengers accurately enough to identify them because it was dark. He stated that the driver's side window of the car, the only one he could see, was tinted, making it difficult to see the car's occupants. After sitting in the alley for five seconds, the car reversed onto Cortland; a matter of seconds later he heard shots. He got in his car and tried to find the car; he was not able to. After a minute or so, he saw a police car and told police about the shooting.

After Deputy Velez's testimony, codefendant Almodovar called two alibi witnesses, whose testimony is not relevant to this appeal. Thereafter, codefendant himself testified in support of his alibi defense and testified that he was not an Insane Dragon any longer at the time of his arrest. He admitted on cross-examination that he had found out about a truce between the Insane Dragons and the Disciples from defendant and that he knew defendant to be an Insane Dragon.

The defense also introduced a stipulation that if Detective Dombrowski of the Chicago police department were called to testify he would state that he interviewed Grande in the course of investigating the homicide and his notes reflected no mention that the rear seat passenger had a thin, long face or that he had long hair. He would also testify that his notes did not reflect that she told him the driver was also shooting. Finally the defense read to the jury the affidavit of Saez that he signed in the office of attorney Power.

The jury found both defendants guilty of first-degree murder of Amy Merkes and Jorge Rodriguez, guilty of attempted first-degree murder of Kennelly Saez and Jackueline Grande, and guilty of aggravated battery with a firearm of Jackueline Grande. The court sentenced defendant to life imprisonment for the counts of murder and a consecutive term of 30 years at IDOC for the counts of attempted first-degree murder. The court indicated that the conviction for aggravated battery with a firearm would merge into the attempted first-degree murder.

Defendant appeals his conviction. His first argument is that the eyewitness identifications of Saez and Grande are insufficient as a matter of law to prove him guilty beyond a reasonable doubt. Second, he argues the court committed reversible error in admitting evidence relating to the Olon murder. Third, he asserts he received ineffective

assistance of counsel. Finally, he argues he should be granted a new trial because of the State's failure to produce *Brady* material.[1]

## ANALYSIS

### I. SUFFICIENCY OF EVIDENCE

Defendant's first argument on appeal is that the eyewitness testimony of Grande and Saez is, as a matter of law, insufficient to prove him guilty beyond a reasonable doubt. He argues that three factors should lead us to this conclusion: (1) the brevity of the witnesses' opportunity to see their assailants, (2) the absence of corroborating physical evidence, and (3) the witnesses' testimony (including the pretrial affidavit of Saez), which he describes as "fraught with omission, contradiction and inconsistency." For the reasons that follow, we disagree.

On review of a criminal conviction:

" ' "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *** "[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." ' " (Emphasis in original.) *People v. Nitz*, 143 Ill. 2d 82, 95-96, 572 N.E.2d 895, 901 (1991), quoting *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

The State does not point to any physical evidence corroborating the eyewitness identifications, nor is any such evidence apparent from the record. However, this is not itself a reason for reversal. Unless vague or doubtful, eyewitness identification of an accused, even that of a single eyewitness, will sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356, 651 N.E.2d 72, 96 (1995), citing *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989), and *People v. Jones*, 60 Ill. 2d 300, 307-08, 325 N.E.2d 601 (1975). As the State notes, Illinois has adopted the five-factor test set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d

---

[1]Our discussion of the issue of the State's purported *Brady* violation has been omitted from publication in order to comply with revised Supreme Court Rule 23 (166 Ill. 2d R. 23). However, the discussion of this issue is part of the unpublished portion of this decision. A full, unabridged text of this decision is on file with the clerk of this court under docket No. 1—96—0725.

401, 93 S. Ct. 375 (1972), for evaluating eyewitness identifications. The factors are: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Lewis*, 165 Ill. 2d at 356, 651 N.E.2d at 96, citing *Slim*, 127 Ill. 2d at 307-08 and Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1992).

In assessing identification testimony, we will not substitute our judgment for that of the trier of fact on questions involving witness credibility. *People v. Sutton*, 252 Ill. App. 3d 172, 180, 624 N.E.2d 1189, 1196 (1993), citing *People v. Johnson*, 114 Ill. 2d 170, 189-90, 499 N.E.2d 1355, 1363 (1986), and *People v. Pietruszynski*, 189 Ill. App. 3d 1071, 1076-77, 545 N.E.2d 942, 946 (1989). Moreover, discrepancies and omissions as to facial and other physical characteristics are not fatal, but merely affect the weight to be given the identification testimony. *Lewis*, 165 Ill. 2d at 357, 651 N.E.2d at 96, citing *Slim*, 127 Ill. 2d 302, 537 N.E.2d 317. Such discrepancies and omissions do not in and of themselves generate a reasonable doubt as long as a positive identification has been made. *Lewis*, 165 Ill. 2d at 357, 651 N.E.2d at 96, citing *Slim*, 127 Ill. 2d at 309.

■ Viewed in the light most favorable to the prosecution, the eyewitness testimony in this case substantially satisfies the five factors enumerated in *Lewis*. The record amply supports the inference that both witnesses' attention was fixed squarely on the car and its occupants. Saez, especially, was attempting to identify the vehicle's occupants because when they called out a gang-related greeting to him, he was concerned that they might actually be members of a rival gang misrepresenting themselves. Although the witnesses' descriptions of defendants to the police the day after the event were not detailed, they did not conflict with or rule out defendants as the perpetrators. The witnesses clearly and unequivocally identified defendants as the perpetrators at the in-person lineups and in court; Grande also so identified them when she was presented with the photo array. These identifications occurred within days after the shootings. Further, Saez's and Grande's identifications reinforced each other. See *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1156 (7th Cir. 1987) (eyewitnesses' consistent identifications of driver and passenger involved in drive-by shooting held mutually reinforcing absent suggestion of collusion).

It is true that the surviving victims in this case admitted that they did not have more than several seconds to identify their attackers.

And, while Saez testified that he was quite close to the car, only a few feet away, Grande was farther back, near the building. However, these factors do not require the conclusion that the witnesses' identifications of defendants were so fraught with doubt as to raise a reasonable doubt as to defendant's guilt. See, *e.g., People v. Herrett*, 137 Ill. 2d 195, 561 N.E.2d 1 (1990) (eyewitness had sufficient opportunity to observe and identify assailant where he viewed his face for "a few seconds" in a dimly lit pawnshop before his eyes were covered with duct tape); *People v. Moore*, 264 Ill. App. 3d 901, 911, 637 N.E.2d 1115, 1122-23 (1994) (two eyewitnesses, one of whom had been drinking, observed defendant for a "few seconds" from a dark viaduct; this held sufficient to uphold conviction); *People v. Rodriguez*, 134 Ill. App. 3d 582, 589-90, 480 N.E.2d 1147, 1152 (1985) (identification testimony of witness who saw defendant's face for only a couple of seconds, from a second-story window, and did not identify defendant until his testimony in court, nine months after the incident, held "sufficiently reliable to permit him to testify").

Defendant's reliance on *People v. Thompson*, 121 Ill. App. 2d 163, 257 N.E.2d 197 (1970), is misplaced. In that case a panel of this court reversed a conviction for rape because the victim only viewed her assailant for about 10 seconds before the attack and was blindfolded during the attack. The case was reversed on the grounds that the complainant "lacked a sufficient opportunity to observe her assailant" (*Thompson*, 121 Ill. App. 2d at 168, 257 N.E.2d at 199), although the court also observed that the witness was unable to state whether her assailant was clean-shaven, did not know what color his eyes were, identified him as being 5 feet 9 inches in height (whereas the accused was 6 feet 1 inch tall), and stated he was wearing a coat of a type the accused's sister testified he did not own. *Thompson*, 121 Ill. App. 2d at 167-68, 257 N.E.2d at 198-99.

*Thompson* does not require reversal in this case. First, *Thompson* is distinguishable on its facts, specifically the facts that there was only one witness, at least one characteristic the witness attributed to her assailant (height) was materially different from the accused, and there were suggestive pretrial encounters with the accused (the victim was called to the police station after the defendant had been arrested and saw him handcuffed to a chair; she was also present at a pretrial hearing where he was identified as the defendant in the case). More importantly, *Thompson* was decided before Illinois adopted the five-factor test the Supreme Court enunciated in *Neil*—in fact, *Thompson* was decided before *Neil* itself (1970 versus 1972). Under *Neil* an eyewitness's limited opportunity to view a perpetrator is only one factor, a "single component of a test based on the totality of the circum-

stances." *Kosik*, 814 F.2d at 1157. Of course if a witness had *no* opportunity to view the perpetrator such a fact would be conclusive, but that is not this case. Assuming that *Thompson* was decided correctly on the facts before it, such facts are not present in this case and the mode of analysis has been clarified since that decision was handed down.

We finally note that numerous cases decided since *Thompson* have upheld convictions based on eyewitness identifications based on a far briefer viewing opportunity than was present in *Thompson*. See *Herrett*, 137 Ill. 2d 195, 561 N.E.2d 1; *Moore*, 264 Ill. App. 3d 901, 637 N.E.2d 1115; *Rodriguez*, 134 Ill. App. 3d 582, 480 N.E.2d 1147.

■ Defendant also argues that based on the exhibits and testimony establishing that the nearest streetlights were at the corners, at least 20 to 30 feet away, and that the light directly over the doorway was only a single bulb, the illumination was insufficient for a positive identification to be made. He further argues that the testimony of Velez establishes that the windows on the car were tinted, further impeding observation of the vehicle's occupants. He also argues Saez's testimony in court was contradicted by his pretrial affidavit given to attorney Powers. Again, these contentions are meritless. With respect to defendant's contentions regarding the lighting, we note that all four witnesses who were present at the scene, including not only Grande and Saez but also Officers Lohman and Butler, described and characterized the lighting conditions as very good.[2] Moreover, Grande and Saez denied that the windows of the car were tinted. Furthermore, any tinting of the windows would have been in any event largely irrelevant, as the witnesses stated that the front window was completely rolled down and the rear window was halfway down during the encounter and the shooting, when the victims claimed to have seen the perpetrators. Defense counsel vigorously cross-examined each witness regarding the lighting conditions, including using photographs to demonstrate that the nearest streetlights were on the south side of Cortland at the corners of Harding on the west and the alley into which the car turned on the east. However, while cross-examination revealed certain infirmities in the placement of the lights, the witnesses never wavered in maintaining that the light was sufficient for them to identify the killers. Thus we cannot say that the evidence of the victims' ability to see their attackers was so improbable as to raise a reasonable doubt as to the defendants' guilt.

---

[2]While Velez testified that the windows of the car were tinted, his confrontation with the car occurred in the alley, not at the scene of the shooting, and thus his testimony does not contradict testimony of the State's witnesses regarding the lighting conditions at the scene.

Likewise, defendant's argument regarding Saez's pretrial affidavit is at best an argument challenging Saez's credibility, insofar as his in-court testimony was impeached by his earlier statement. However, notwithstanding that the prior statement was sworn, his credibility and the determination of the facts remain matters for the jury to resolve. See *Walker v. Midwest Emery Freight Systems, Inc.*, 200 Ill. App. 3d 790, 798-99, 558 N.E.2d 470, 476 (1990) (probative value of a witness' trial testimony is not destroyed by inconsistent out-of-court statements, including sworn deposition testimony). See also *Nitz*, 143 Ill. 2d at 104, 572 N.E.2d at 904 (credibility determinations solely a matter for the fact finder). Moreover, while the jury was made well aware of the affidavit, the State through Saez's own testimony offered a plausible explanation for it. We therefore will not overturn the jury's determination that Saez was telling the truth at trial, rather than in the affidavit. See *Nitz*, 143 Ill. 2d at 104, 572 N.E.2d at 904 (reversal not warranted where fact finder was made aware of infirmities in testimony but received plausible explanation).

Accordingly, the eyewitness evidence in this case is more than sufficient to uphold defendant's conviction.

## II. MOTIVE EVIDENCE

Defendant next argues the State committed reversible error by introducing evidence of the murder of Carlos Olon as a basis for attributing to defendant a motive of retaliation. He refers to two sources for this information: the testimony of Detective Guevara that he was investigating the murder of Olon, which had occurred two days before the crime in this case; and the testimony of Detective McMurray regarding the police reports he discovered in the apartment of Leandro Marin. Defendant argues that the State did not prove nor could it have proven that either he or his codefendant was even aware that Olon had been shot, much less that they knew or believed he had been shot by a Disciple. Absent such evidence, he asserts, the evidence was improper and prejudicial, and he must receive a new trial.

The State argues that the testimony of Guevara and McMurray corroborated its theory "that the murders of Merkes and Rodriguez were part of the gang war in progress at the time and that they were murdered in retaliation for the murder of Olon." The State further argues that Guevara's testimony also was admissible because the fact that he was investigating the Olon case explained how he obtained pictures of codefendant, which led to his obtaining pictures of defendant. With respect to McMurray, the State argues in addition that the evidence rehabilitated Saez by explaining his prior inconsistent affidavit and corroborated its theory that there was a link between the Olon

murders and the murders in this case because "gang members such as Leandro Marin saw a connection between the two cases." The State also argues that even if admission of any of the evidence was error, it was harmless error, as a panel of this court has already held in codefendant's appeal from his conviction. *People v. Almodovar*, No. 97—1003, slip op. at 28-29 (July 16, 1997) (unpublished order under Supreme Court Rule 23). We find that admission of the evidence may well have been erroneous, but in any event would have been harmless error.

First, neither the testimony of Guevara nor the testimony of McMurray was admissible to establish motive on the part of defendant. The State argues that gang-related evidence is admissible if it is related to the crime charged, citing *People v. Gonzalez*, 265 Ill. App. 3d 315, 326, 637 N.E.2d 1135, 1143 (1994), *People v. Gonzalez*, 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867 (1991), and *People v. Rivera*, 145 Ill. App. 3d 609, 495 N.E.2d 1088 (1986). This is correct as a general proposition but misses the thrust of defendant's argument. He admits that relevant gang-related evidence is not subject to exclusion simply because of potential prejudice. His argument is that the evidence regarding the Olon murder was *irrelevant* because the State failed to introduce any evidence establishing that he was even aware of the murder, much less any evidence that Olon had been murdered by a Disciple (which he argues would also be necessary to attribute to him a motive for revenge on the Disciples).

In this regard defendant's contentions are well taken. Although the State may introduce motive evidence, including gang evidence, it must show that a defendant was aware of the facts purporting to establish a motive. *People v. Smith*, 141 Ill. 2d 40, 56, 565 N.E.2d 900, 906 (1990) (reversing a murder conviction because of improper introduction of gang-related motive evidence). "Motive in the abstract," *i.e.*, evidence that someone may have had a motive at some time to kill the deceased, is inadmissible. Motive must be attributable to the defendant at the time of the crime. *Smith*, 141 Ill. 2d at 57, 565 N.E.2d at 907.

The State seeks to distinguish *Smith* on the basis that in that case it was not established that the defendant was even a member of the gang that might have had a motive to conduct the murder. This distinction, however, has been rejected by our supreme court in a subsequent case following *Smith* despite the fact that the court assumed defendant had been established to be a member of the relevant gang. See *People v. Easley*, 148 Ill. 2d 281, 330, 592 N.E.2d 1036, 1058 (1992) ("defendant's status as a [member of the gang] failed to establish that Taylor's murder was gang-related and that defendant was involved in a conspiracy to murder Taylor").

We also reject the State's alternative arguments in favor of admissibility of the evidence. Clearly, the limited relevance of how Detective Guevara came to be in possession of photographs of defendant and codefendant is an insufficient basis for introduction of the otherwise inadmissible evidence of the Olon murder. See *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993) (even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury). Moreover, this was not the purpose for which the evidence was in fact offered, as can be seen from the fact that the State argued that defendants were acting in retaliation for a murder in both its opening and closing arguments.

The alternate arguments in support of the McMurray evidence were that the evidence rehabilitated Saez by explaining his prior inconsistent affidavit and corroborated the State's theory that there was a link between the Olon murders and the murders in this case because "gang members such as Leandro Marin saw a connection between the two cases." First, these arguments fail because no competent evidence was introduced to establish that Marin was a Disciple, an Insane Dragon, or anything but a total stranger to the defendants and witnesses in the case. When Detective McMurray testified that he knew Marin to be a member of the Insane Dragons, the court sustained both defendants' objections and ordered the comment stricken. Without this testimony, the evidence was totally unconnected even to the theories the State advances and was utterly irrelevant. Second, the evidence would have been irrelevant even if the State had established that Marin was an Insane Dragon. Establishing that there was a connection between the murders was again irrelevant unless the State showed *defendant* was aware of or believed there to be such a connection. And any support the evidence might have given to the State's theory that Saez was coerced into giving his inconsistent pretrial affidavit is wholly tenuous and remote. The fact that one otherwise anonymous Insane Dragon had copies of reports pertaining to the two cases in the same place does not support an inference that there was a conspiracy between his gang and the Disciples to coerce Saez into giving a false pretrial affidavit. The State failed to carry its burden (see *Smith*, 141 Ill. 2d at 57, 565 N.E.2d at 907; *Easley*, 148 Ill. 2d at 330, 592 N.E.2d at 1058) of connecting the evidence to the case at hand.

■ Even though the admission of the foregoing evidence was erroneous, however, the error was harmless. Erroneous admission of gang evidence does not automatically warrant reversal. The effect of inflammatory evidence depends upon the circumstances of the case.

*Easley*, 148 Ill. 2d at 330, 592 N.E.2d at 1058. Error in the admission of evidence is harmless when the competent evidence in the record establishes a defendant's guilt beyond a reasonable doubt and it can be concluded that a retrial without the erroneous evidence would produce the same result. *People v. Arman*, 131 Ill. 2d 115, 124, 545 N.E.2d 658, 662 (1989) (affirming despite improper introduction of mug shot evidence); *People v. Moore*, 171 Ill. 2d 74, 98, 662 N.E.2d 1215, 1226 (1996) (affirming despite improper introduction of DNA evidence). Evidence of the Olon murder may have given the jury a speculative basis for an inference that defendant had a specific motive of retaliation for that murder. However, even absent this evidence the jury would have had the general gang evidence before it—to which defendant has disavowed any objection—that defendant was an Insane Dragon, and the Insane Dragons were at war with the Disciples, of which Rodriguez and Saez were members and whose gang colors Merkes was wearing at the time of the incident. Motive could have been inferred from this evidence alone, which dilutes any potential prejudice to defendant from the erroneous introduction of the evidence of the Olon murder. Also there remains the strong eyewitness evidence which we have already determined constituted a sufficient basis for defendant's conviction.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant's next argument is that he did not receive effective assistance of counsel at trial because of counsel's "failures to challenge the State's eyewitness identification evidence with known, available evidence." As shall be discussed below, defendant attempts to support this argument with affidavits appended to his codefendant's motion for a new trial, with which defendant sought to supplement the record on this appeal. Specifically, defendant complains of counsel's failure to call attorney Melinda Power or her sister Margaret Power to impeach Saez's testimony regarding the circumstances of his affidavit;[3] his failure to call attorney Power or Amy Myers, an investigator in Powers's employ, to impeach Grande with the alleged fact that the police had shown her photographs at the hospital and told her "here are the guys who did it" in contradiction to her testimony at trial denying this having taken place;[4] and his failure to investigate whether Saez's lineup

---

[3]Attorney Powers and her sister stated in affidavits that they did not observe Ki Ki telling Saez what to say while he was giving his affidavit in Powers's office.

[4]Attorney Powers stated in her affidavit that when she and her investigator interviewed Grande in 1995, Grande told them that the police had done this when they visited her in the hospital the day after the shooting.

identification was influenced by suggestive police tactics. We find no cause for reversal.

■ Whether a defendant received effective assistance of counsel is governed by the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In order to succeed on a claim of ineffective assistance of counsel, a defendant must show:

> " '(1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under "prevailing professional norms"; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. [Citation.] To establish the deficiency of counsel's performance, the defendant must overcome the "strong presumption" that his counsel's representation fell within the "wide range of reasonable professional assistance." [Citation.] As such, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." ' " *People v. Ruiz*, 177 Ill. 2d 368, 385, 686 N.E.2d 574, 582 (1997), quoting *People v. Franklin*, 135 Ill. 2d 78, 116-17, 552 N.E.2d 743 (1990), quoting *Strickland*, 466 U.S. at 688, 689, 80 L. Ed. 2d at 693-94, 694-95, 104 S. Ct. at 2064-65, 2065.

As the State observes, defendant cannot satisfy either prong of the *Strickland* analysis.

■ With respect to establishing prejudice, " '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test. ***' [Citation.] Rather, a defendant is required to show that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " *People v. Collins*, 106 Ill. 2d 237, 274, 478 N.E.2d 267, 283 (1985), quoting *Strickland*, 466 U.S. at 693, 695, 80 L. Ed. 2d at 697, 698, 104 S. Ct. at 2067, 2069. There is no evidence in the record establishing how the potential witnesses would have testified if called, and accordingly there is no basis for a conclusion that the fact finder would have had a reasonable doubt regarding guilt if defense counsel had done what defendant in hindsight suggests he should have done.

As noted above, defendant has attempted to establish prejudice through affidavits appended to his codefendant's motion for a new trial, with which he moved to supplement the record on appeal and which he included in the appendix to his brief to this court. However, this court correctly denied him leave to supplement the record with

those materials. The basis for the denial was that defendant did not attach the affidavits to his posttrial motion, they were never presented to the trial court in the context of defendant's case, and accordingly any argument based thereon is waived. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988); *People v. Gilbert*, 224 Ill. App. 3d 624, 632, 586 N.E.2d 1308, 1313 (1992). Accordingly, they are not properly before us and may not be considered. *People v. Gacho*, 122 Ill. 2d 221, 254, 522 N.E.2d 1146, 1162 (1988) (attaching materials to an appellate brief as an appendix is an improper means of supplementing the appellate record and only that which appears in the record on appeal may be considered). Thus defendant has not established prejudice and his claim of ineffective assistance fails.[5]

Moreover, even were we to ignore the fact that defendant relies wholly on materials outside the record to establish prejudice, we would not find that defense counsel's performance was deficient. Decisions concerning which witnesses to call at trial and what evidence to present are matters of trial strategy and cannot form the basis for a claim of ineffective assistance of counsel unless a strategy is so unsound that counsel can be said to have entirely failed to conduct any meaningful adversarial testing. *People v. Reid*, 179 Ill. 2d 297, 310, 688 N.E.2d 1156, 1162 (1997), citing *People v. Madej*, 177 Ill. 2d 116, 148-49, 685 N.E.2d 908 (1997). Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. *People v. Vera*, 277 Ill. App. 3d 130, 138, 660 N.E.2d 9, 16 (1995).

Defendant cites several cases that have held that failure to present witnesses or evidence to directly contradict or impeach prosecution witnesses was ineffective assistance. See, *e.g., People v. Butcher*, 240 Ill. App. 3d 507, 510, 608 N.E.2d 496, 498 (1992); *People v. Salgado*, 263 Ill. App. 3d 238, 247, 635 N.E.2d 1367, 1373 (1994); *Vera*, 277 Ill. App. 3d at 140, 660 N.E.2d at 17-18. However, in each of the above

---

[5]The appropriate procedure is to raise such matters in a timely petition for postconviction relief under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994); *Gilbert*, 224 Ill. App. 3d at 633, 586 N.E.2d at 1314; *People v. Kunze*, 193 Ill. App. 3d 708, 725-26, 550 N.E.2d 284, 296 (1990) (issues which require consideration of matters outside of the record, specifically including ineffective assistance of counsel, are more appropriately addressed in proceedings on a petition for postconviction relief than on direct appeal)) or perhaps section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994), *People v. Brown*, 169 Ill. 2d 94, 107, 660 N.E.2d 964, 970 (1995) (a criminal defendant may obtain relief under section 2—1401 from a conviction obtained based on false testimony without establishing that the prosecution knew the testimony was false)).

cases there was no potential adverse impact to calling the witness or presenting the evidence in question. In the case *sub judice*, on the other hand, counsel could have determined that the minimal support to his case from calling attorney Powers or the persons working with her (Powers's sister and Amy Myers) would have been outweighed by cross-examination. We note that the affidavits of attorney Powers and her sister implicitly concede that not only did Ki Ki, a gang chieftain, accompany Saez to Powers's office, he was present *in* the office while Saez was giving the affidavit. This would lend credence to Saez's in-court testimony that he was coerced by his gang to provide Powers with his affidavit. The defense's theory that Saez fabricated this explanation for the affidavit could also have been severely undermined by questions to Powers concerning, for instance, why she decided to contact Saez again after he had once refused to give her a statement. With respect to the impeachment of Grande, as the State points out, Grande testified that she did not remember the police showing her any pictures at the hospital. To have called Powers or Myers to testify that she had told them the police did show her such photos could have provoked a backlash from the jury. Defense counsel may well have been concerned that the jury would view this as a weak attempt to impeach the credibility of an otherwise sympathetic witness who had herself been shot and witnessed the death of a friend in an unprovoked shooting. Counsel could legitimately have decided that the proper course would be to question Grande's ability to identify the offenders, rather than attempting to call into question whether she was telling the truth. In short, this is not a clear-cut case of failure to call a witness or introduce evidence which would unequivocally have helped defendant. It was a matter of trial strategy and did not constitute ineffective assistance. See *People v. McKenzie*, 263 Ill. App. 3d 716, 722-23, 635 N.E.2d 903, 908 (1994) (fear of cross-examination constitutes reasonable basis not to call a witness (in this case the defendant, who was proceeding on a theory of self-defense and had no criminal record)).

Nor was it ineffective assistance for counsel purportedly to have failed to investigate whether Saez's lineup identification was influenced by suggestive police tactics. Defendant relies on an affidavit of Saez attached to codefendant's posttrial motion in which he states that the day that he viewed the lineup he was shown a photo spread and picked out defendant and codefendant before he viewed the lineup. Again, this is material outside the record, and again, even if that defect could be ignored, the material would not provide grounds for reversal. The affidavit contains no hint that the police suggested whom Saez should pick out of the photo array or the lineup nor that it was clear from the photos who the offenders were. The photo array would

not have impeached Saez's lineup or in-court identifications of defendants because in his affidavit he states that he picked the same persons out of the photo array that he picked in the lineup. The mere fact that a witness is shown a photograph array before viewing a lineup does not taint the lineup identification unless the photos themselves were "so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification." *People v. Goka*, 119 Ill. App. 3d 1024, 1027, 458 N.E.2d 26 (1983); see also *People v. Purnell*, 129 Ill. App. 3d 253, 262, 472 N.E.2d 183 (1984). There is no hint that the photos were suggestive.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

LEAVITT, P.J., and CAHILL, J., concur.