THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID HERNANDEZ, Defendant-Appellant.

First District (3rd Division)     No. 1—99—0264

Opinion filed April 12, 2000.

CAHILL, P.J., dissenting.

Kenneth N. Flaxman, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

This was, as the trial judge said, "a one-witness shooting in the streets of Dixmoor." The court believed the witness' identification testimony and convicted David Hernandez (Hernandez) of first degree murder. On appeal Hernandez contends the prosecution's identification evidence was insufficient to support his conviction. We agree with Hernandez. We reverse his conviction.

FACTS

In the afternoon of April 24, 1997, Andrew Grant (Grant) was shot and killed in Dixmoor, Illinois. On the night of the shooting and again on May 13, 1997, in the course of their investigation, Illinois State Police officers spoke with the lone eyewitness to the shooting, Jerry Phillips (Phillips). On May 29 and June 26, 1997, the police showed Phillips photos of Hernandez, and on July 24, 1997, the police arrested Hernandez for Grant's murder. Phillips identified Hernandez as the gunman in a July 25, 1997, lineup. Hernandez was charged with first degree murder.

Hernandez filed a motion to suppress Phillips' eyewitness

testimony. After Hernandez waived a jury trial, the court said it would conduct a hearing on the motion to suppress along with a bench trial.

At trial, Phillips testified.

Around 3 p.m. on April 24, 1997, Phillips, a school bus driver, was sitting in the driver's seat of his bus, waiting to pick up a child. Phillips noticed two vans four to five car lengths, or 90 feet, away from his bus. Two men—"two young men around the ages of nineteen, twenty years old"—stood between the vans, and one man stood in front of them, Grant. Phillips identified Hernandez as one of the two young men standing between the vans.

According to Phillips, Hernandez was arguing with Grant when Hernandez suddenly pulled out a gun and began shooting Grant. Grant fell to the ground and struggled to his feet. Hernandez shot Grant again, and Grant scrambled to escape across the street. Phillips saw Hernandez shoot Grant four times and shoot into Grant's van once. After the shooting, Hernandez and the other young man jumped into their van and sped away. Phillips reported the shooting to "base" and waited in his bus until he could speak to the police.

Phillips said the police contacted him on May 29, 1997, to view a photo array. He was shown two separate folders, each containing six photos. From one of the folders, Phillips identified a photo of the young man who was with the shooter. From the other folder, Phillips pointed to photos of men wearing braided hairstyles like those of the shooter. But he did not identify the defendant as the shooter. The defendant's photo was in that folder.

Phillips said he viewed another photo array on June 26, 1997, and identified Hernandez. According to Phillips, he told the police "there's your one you're looking for right there." He explained, "that's the profile that I seen when the guy turned his head toward me." Phillips said he told the police, "That the profile of the—of his—of that photograph is the perfect form of the shooter, without the hair." On July 25, 1997, Phillips positively identified the defendant in a lineup.

On cross-examination, Hernandez' attorney asked Phillips for a physical description of the two young men between the vans. Phillips said they were both "about the same height" and "[a]bout the same weight," though he added, "I wasn't paying too much attention to how big they was. Neither one of 'em was fat."

Phillips said he gave the police a written statement on the night of the shooting. This statement contained little description of the two young men—"one light skinned and one dark skinned"—between the vans. Phillips acknowledged he spoke with the police on May 13, 1997, and provided a physical description of the two young men. Hernandez' attorney and Phillips engaged in this exchange:

"Q. One of the individuals you described as a dark male Black, approximately five foot ten, one hundred and seventy-five pounds, is that right?

A. Yes, sir.

Q. The other individual you described as five foot seven, one hundred and fifty-five pounds, light skin, did you not?

A. Yes, sir.

Q. You said at that time that the dark male Black pulled out a gun and shot Mr. Grant, isn't that what you said?

A. I believe that's what is on the paper.

Q. Well, did you say that, sir? Do you recall whether or not you said that?

A. I don't remember saying that.

Q. You don't remember whether you said that it was the dark male Black that shot Mr. Grant?

A. I don't believe I said that.

\* \* \*

Q. \*\*\* At that time, Mr. Phillips, did you say to the police \*\*\* on May 13th, that you were unsure if you could identify the two suspects because you were looking at the back of their heads most of the time?

A. I told 'em I couldn't make a positive identification until he had turn't sideways and I could see his profile of his face.

Q. So you're saying that you told the police you—you could identify him when he turned and you could see his profile?

A. Yes, sir."

On May 29, 1997, Phillips repeated to the police, "That the only way I could recognize him, when I seen the profile." When Phillips identified Hernandez as the shooter on June 26, 1997, he told police, "that's the profile and that's the identification." Phillips said when the police initially spoke with him at the scene of the shooting, he told them to pursue "two, young males" approximately "seventeen, twenty-two years old." According to Phillips, he observed the two young men for "a good ten minutes" before the shooting, but conceded he spent most of that time staring at the backs of their heads.

On redirect examination, Phillips said the shooter was darker skinned than the other young man. Phillips added the young men were "[a]bout 5'2", three, four" tall and "[a]bout a hundred and fifty-five, a hundred sixty pounds." On examination by the court, Phillips clarified Hernandez was the dark-skinned young man.

At the close of the trial, the court denied Hernandez' motion to suppress, finding the photos and their presentations were not suggestive. The court further found Phillips' testimony sufficiently established Hernandez' guilt and sentenced him to 50 years imprisonment. This appeal followed.

DECISION

■ When a defendant challenges the sufficiency of the evidence supporting his conviction, we ask whether, viewing this evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty of the essential elements of the crime beyond a reasonable doubt. *People v. Gilliam*, 172 Ill. 2d 484, 515, 670 N.E.2d 606 (1996). Our supreme court recently has instructed:

> "[I]t is our duty in the case at bar to carefully examine the evidence while giving due consideration to the fact that the court *** saw and heard the witnesses. [Citations.] If, however, after such consideration we are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction." *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365 (1999).

That is, a criminal conviction cannot stand on appeal if the prosecution's evidence is so weak as to create a reasonable doubt of the defendant's guilt. *Gilliam*, 172 Ill. 2d at 515.

■ A single eyewitness identification can support a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356, 651 N.E.2d 72 (1995). The United States Supreme Court, in *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972), offered five factors for evaluating the reliability of an eyewitness identification: (1) the witness' opportunity to view the criminal at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness when identifying the defendant as the criminal; and (5) the length of time between the crime and the identification. Illinois courts consider these factors. See *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317 (1989).

■ Here, Phillips' testimony is not reliable. On April 24, 1997, Phillips watched for nearly 10 minutes as the two young men between the vans argued with the man in front of the vans. But Phillips' attention was riveted on the backs of the two young men's heads until the shooter momentarily exposed his profile to Phillips, sitting in a school bus 90 feet away.

Phillips' description of the shooter on May 13, 1997—5 feet 10 inches, 175 pounds—conflicted with his description of the shooter at trial—5 feet 2 to 4 inches, 155 to 160 pounds. While this disparity alone does not create a reasonable doubt as a matter of law (see *People v. Negron*, 297 Ill. App. 3d 519, 530, 697 N.E.2d 329 (1998)), it certainly is no endorsement of Phillips' powers of observation. In addition, on May 13, Phillips told officers he was "unsure" if he could identify

anyone because he was "looking at the backs of their heads most of the time."

Three months after the shooting, on July 25, Phillips identified Hernandez in a lineup. Between those two events, the police twice showed photos to Phillips. Each time, Hernandez' photo was included. The first time, there was no identification of Hernandez' face. The second time, on June 26, 1997, two months after the shooting, there was an identification: Phillips recognized Hernandez' profile, or, as he told police, the shooter's "jaw and cheek." Considering the totality of the circumstances (see *People v. Kelley*, 304 Ill. App. 3d 628, 637, 710 N.E.2d 163 (1999)), Phillips' identification of Hernandez was fatally weak.

We understand great deference should be given to trial judges when they hear the evidence and observe the witnesses. See *People v. Furby*, 138 Ill. 2d 434, 455, 563 N.E.2d 421 (1990). But this deference does not require a mindless rubber stamp on every bench trial guilty verdict we address. That would be an abdication of our constitutional responsibility. And we are not reluctant to examine the record for a lack of evidence linking the defendant to the crime charged. Another division of this court recently performed the identical analysis in a murder case, concluding the uncorroborated testimony of a single eyewitness did not support a guilty verdict. See *People v. Rodriguez*, 312 Ill. App. 3d 920, 934 (2000).

Eyewitness testimony under the best of conditions is subject to all of the frailties of human perception. But here, where the lone eyewitness saw only the back of the shooter's head until he momentarily glimpsed the shooter's profile from 90 feet away, where the eyewitness' testimony is not corroborated by other evidence, and where the photo array procedure inexorably led to a lineup identification three months after the shooting, a first degree murder conviction and a 50-year sentence cannot stand.

## CONCLUSION

Because the prosecution did not prove Hernandez guilty beyond a reasonable doubt, we reverse. We see no reason to address the defendant's motion to suppress the eyewitness testimony.

Reversed.

BURKE, J., concurs.

PRESIDING JUSTICE CAHILL, dissenting:
I respectfully dissent. The typescript of this bench murder trial

runs to some 176 pages, modest by any standard. At its heart is the direct and cross-examination of a single eyewitness who positively identified the defendant in a lineup and at trial. The defense attorney conducted a masterful cross-examination, in which it was established that the eyewitness was unable to positively identify the defendant from a photo array presented to him before the lineup was held. But the defense attorney could not dissuade the witness from his positive identification at the lineup or at trial. Nor was he able to find in this witness a lack of credibility or a motive to lie.

If we examine the reliability of the identification under the five-part *Slim* test (*People v. Slim*, 127 Ill. 2d 302, 307-08 (1989)), we find: (1) the witness watched a murder in broad daylight, but did not at all times observe the face of the shooter; (2) his attention was never diverted from the crime that played out before him; (3) his description of the shooter contains some inconsistencies; (4) he positively identified the shooter in a lineup and again at trial; and (5) the crime took place on April 24, 1997, and the lineup identification occurred July 24, exactly three months later. Three of the tests unquestionably meet the reliability requirement. The other two tests are what this trial was about. The trier of fact heard conflicting evidence on both, particularly with respect to how much of the shooter's face the eyewitness saw and his response to the photo arrays.

The majority reminds us of our duty to carefully examine the evidence while giving due consideration to the fact that the court saw and heard the witnesses. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). I can find nothing in this opinion that reflects due consideration for what the judge in this case saw and heard at trial. The majority does not cite to the four-page summation of the evidence made by the trial judge. The judge's assessment of the evidence, his opinion of the credibility of the eyewitness, the comments he made on the conflicting evidence, and his response to the arguments of defense counsel are simply ignored. Each of the issues the majority raises was addressed by the trial judge. I might have a different view of this case if the majority had reviewed the findings of the trial judge, dismantled (or at least criticized) his reasoning, and pointed out where he went wrong. Where inconsistencies and conflicts exist in the evidence, the trier of fact has the responsibility of weighing the credibility of the witnesses and resolving these conflicts and inconsistencies. *People v. Byron*, 164 Ill. 2d 279, 299 (1995).

Unlike a jury trial, where the reasoning of the trier of fact is forever hidden, we have a trial judge here who explained on the record how he reached his decision to find the defendant guilty of murder beyond a reasonable doubt. Because this was a bench trial where the

trial judge explained how he weighed the evidence and assessed credibility, the majority has a rare opportunity to show us why the majority reading of the record is to be preferred. A majority that points out our constitutional obligation not to mindlessly rubber-stamp guilty verdicts must be aware that we also have an obligation not to mindlessly ignore the way the judge resolved conflicting evidence and his assessment of credibility when those findings are of record.

I welcome the reference in the majority opinion (312 Ill. App. 3d at 1037) to *People v. Rodriguez*, 312 Ill. App. 3d 920 (2000), where we reversed a murder conviction, after a jury trial, based on the testimony of a single eyewitness. The evidence that went to impeachment and credibility in the two cases is dramatically different. In *Rodriguez*, the record revealed and the opinion noted that the eyewitness observed the defendant for seven to nine seconds while his hands covered his face. The eyewitness was also subject to "multiple impeachment" at trial. This included prior inconsistent statements, a plea of guilty to a felony charge, the failure to come forward until a $5,000 reward was posted, and the failure of another witness to identify the defendant in a lineup, despite evidence that earlier the other witness may have seen the suspect identified by the primary eyewitness. By contrast, the eyewitness in this case observed a murder in progress for seven to nine minutes in broad daylight and never backed away from his positive identification at the lineup. As for impeachment, the defense attorney here, in his summation to the court, said about the eyewitness in this case: "Mr. Phillips is a hard working guy. He came to court and told you what he saw. I am not suggesting, Judge, for one second that Jerry Phillips got on the stand and lied." Of course, defense counsel then surveyed the evidence and testimony in the case and attempted to show that the witness, though well meaning, was mistaken. He presented what he believed to be reasonable inferences that could be drawn from conflicting evidence. The trial court in his ruling addressed these inferences and came to a different conclusion.

The majority in its analysis of the case has, I believe, paid lip service to the admonition in *People v. Furby*, 138 Ill. 2d 434, 455 (1990), and little else. I can only conclude that the majority has retried the defendant from the written record and substituted its judgment of the weight of the evidence and the credibility of the witness for that of the trial judge.