THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY SCOTT, Defendant-Appellant.

First District (3rd Division)   No. 1—00—2614

Opinion filed March 12, 2003.

Rita A. Fry, Public Defender, of Chicago (Robert D. Swartz, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, and Catherine Crowley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

Following a bench trial, the defendant, Jerry Scott, was convicted of robbery and residential burglary and sentenced to five years' imprisonment in the Department of Corrections. The defendant appeals, raising the following issues: (1) whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt of residential burglary; (2) whether the defendant's robbery conviction is inconsistent with the finding that the defendant was not guilty of armed robbery; and (3) whether the defendant is entitled to a reduction of his sentence.

The defendant was charged by information with the offenses of home invasion, armed robbery and residential burglary. He waived his right to a jury trial. The pertinent testimony at the defendant's bench trial is summarized below.

Cleotha Carter, the 45-year-old victim, testified that a 1993 automobile accident completely damaged his left side. He is blind in his left eye and walks with a cane.

On March 8, 2000, at approximately 11:30 a.m., the defendant knocked on the door of Mr. Carter's apartment. Believing that the defendant, whom he had known for a year, was there to play chess with him, Mr. Carter turned to get his chess set. When he turned around, the defendant was holding a gun at his side in his left hand

and pointed at Mr. Carter. In his right hand, the defendant had Mr. Carter's LINK card and a money order, which had been on top of Mr. Carter's television set. Mr. Carter explained that a LINK card is used in place of food stamps to purchase groceries. On March 8, 2000, Mr. Carter had a $75 balance on the LINK card. The money order was for $500, but it had not been filled out yet.

Mr. Carter told the defendant "don't be playing no damn games." The defendant responded, "I'm not playing no M.F. games, I'm sick." Mr. Carter added that the defendant told him that he needed "dog food," which Mr. Carter understood to mean heroin. The defendant then demanded Mr. Carter's LINK card code number, which permits a store to accept the card. Mr. Carter started to give the defendant the number, but the defendant remembered that he knew the number from other trips he had made with Mr. Carter to the grocery store. The defendant cocked the hammer of the gun back and backed out of Mr. Carter's apartment.

After the defendant left the apartment, Mr. Carter called 911. Mr. Carter then accompanied the police as they rode around the area searching for the defendant. The defendant was apprehended a short time later. The police returned the LINK card to Mr. Carter, but he never got the money order back.

Mr. Carter acknowledged that he had been imprisoned for auto theft, forgery and possession of an illegal weapon. He was last released from prison in 1992. He did spend time in the lockup in 1995.

On cross-examination, Mr. Carter denied that he had used crack cocaine on March 8, 2000. He denied that he had been convicted of theft in 1990. However, when defense counsel presented a certified copy of the conviction, Mr. Carter stated that, while he could have been convicted in 1990, he did not recall pleading guilty and being sentenced to two years' imprisonment consecutive to another case in which he pleaded guilty to possession of a stolen motor vehicle. According to Mr. Carter, his 1993 accident caused him to have difficulty remembering things in the past. He acknowledged that in 1995 he twice pleaded guilty to theft and was sentenced to time served in one case and time served and a fine in the other.

Mr. Carter denied calling anyone else before calling the police to report what had happened. He did not recall telling a detective and an assistant State's Attorney that he had called Officer Clemmons, a police officer in the 6th District, his brother, Lamark Carter, who was the warden at the Joliet Correctional Center, and his sister-in-law to tell them what had happened.

Mr. Carter denied that he went to the Swan Foods store earlier in the day on March 8, 2000, to obtain money to buy crack cocaine. He

further denied giving a bag of cocaine to the defendant and leaving the grocery store with a young lady to return to his apartment and smoke the cocaine with her. Mr. Carter also denied telling the defendant to meet him later.

Mr. Carter did recall a conversation he had with a police officer at his apartment in which he told the officer that the defendant and he were having a normal conversation until the defendant picked up the LINK card and told Mr. Carter that he was taking it because he was sick and needed "dog food," referring to heroin.

Mr. Carter acknowledged that at the defendant's preliminary hearing, he had testified that the gun was in the defendant's right hand and the LINK card and money order were in the defendant's left hand. Mr. Carter described the gun as black with brown handle grips. He had never seen the defendant with a gun prior to March 8, 2000.

On redirect examination, Mr. Carter acknowledged that at the defendant's preliminary hearing, he had testified that the defendant did not take the LINK card and the money order from Mr. Carter's person.[1]

Bashar Fakhoury, owner and manager of Swan Foods, testified that he was working at the store on March 8, 2000, and did not recall seeing either Mr. Carter or the defendant in the store.

The State then rested. The trial court denied the defendant's motion for a directed finding.

The parties then stipulated that if Officer J. McGee were called as a witness, he would testify that from a custodial search of the defendant following his arrest, the police retrieved a LINK card belonging to the victim. However, the search revealed no money, gun, money order, receipt or any illegal drugs. Officer McGee would further testify that in his conversation with Mr. Carter at his apartment, Mr. Carter never stated that the defendant told him that he needed "dog food."

The parties further stipulated that if Officer Docherty were called as a witness, he would testify that Mr. Carter told him the following. When the defendant first entered Mr. Carter's apartment, there was a friendly exchange of name-calling, and then the defendant asked Mr. Carter to loan him $20. Mr. Carter told the defendant that he did not have $20 and that, if he did, he would have to charge him interest. At that point, the defendant pulled out a .45-caliber handgun from the

---

[1] On redirect examination, the prosecutor attempted to "clarify" Mr. Carter's testimony as to whom he contacted after the defendant left his apartment. Although much of his testimony was objected to, it appears that Mr. Carter did call his brother and did speak to his sister-in-law.

right side of his pants and pointed it at Mr. Carter, telling him that he was sick and ordering Mr. Carter to give him Mr. Carter's LINK card. With his left hand, the defendant removed the LINK card and a blank money order from the top of the television set. Mr. Carter also complied with the defendant's request to give him the code to the LINK card. The defendant then walked backwards out of the apartment and fled. Mr. Carter then called Officer Clemmons, telling him that Mr. Carter had just been held up. Mr. Carter also called his brother, the warden at Joliet Correctional Center, but was unable to contact him. He then called his brother's house and spoke to his sister-in-law, who told him not to lose his cool and not to become violent but to contact the police.

According to Officer Docherty's stipulated testimony, a search of the defendant revealed the LINK card and a receipt from Swan Foods, matching Mr. Carter's LINK card and showing a -0- balance. Mr. Carter never told the officer that the defendant stated that he needed "dog food."

The defendant testified that on March 8, 2000, he met Mr. Carter, who asked him if he knew where he could trade food stamps for cash. At the defendant's suggestion, they walked over to Swan Foods. Mr. Carter gave the defendant $3 and then gave him his LINK card. The defendant obtained the cash and gave it to Mr. Carter. The defendant then took Mr. Carter to purchase crack cocaine from someone the defendant knew. After purchasing the drugs, Mr. Carter saw a young lady that the defendant knew. Mr. Carter gave the defendant $5 and indicated that the young lady and he were going back to Mr. Carter's apartment.

A short time later, the defendant went to Mr. Carter's apartment, where he encountered the same young lady and Mr. Carter. Mr. Carter gave him his LINK card. The defendant did not have a gun, and he was not given a $500 money order. The defendant then returned to Swan Foods to get more money for Mr. Carter for more drugs. However, there were insufficient funds available on the card, so the defendant left the store with the receipt. The defendant was arrested approximately one block from Swan Foods. He did not run from the police or resist arrest.

On cross-examination, the defendant acknowledged that the young lady was a friend of his but that he did not remember her name. On redirect examination, the defendant testified that he spent the $8 Mr. Carter gave him on lottery tickets but, because they were not winning tickets, he threw them away.

After closing arguments, the trial court orally reviewed the testimony and concluded as follows:

"Mr. Carter was impeached in a number of areas because he talked to a couple of different police officers, testified differently in court.

Mr. Scott's story is imaginative. Some amazing coincidences. And I believe the part where he got stopped by the police. I believe Mr. Carter's testimony of the—his recollection was not recalling the future but has problems with memory of the past, does not affect his memory of the present.

Having considered all of the evidence, having considered the credibility of the witnesses, which is basically Mr. Carter and Mr. Scott, having considered the impeachment areas of Mr. Scott, as to the charge of home invasion, there will be a finding of not guilty.

As to the charge of—there was testimony that Mr. Scott was arrested a short period later after this incident took place. There was no weapon recovered. There will be a finding of guilty of the lesser-included offense of robbery and also a finding of guilty of residential burglary."

The trial court imposed concurrent sentences of five years' imprisonment on the two convictions and a concurrent sentence of one year's imprisonment for the defendant's probation violation. The defendant filed a timely notice of appeal.

## ANALYSIS

### I. Residential Burglary Conviction

The defendant contends that the evidence was insufficient to prove him guilty of residential burglary beyond a reasonable doubt because the State failed to prove his entry into Mr. Carter's apartment was unauthorized.

### A. Standard of Review

■ A reviewing court will not set aside a conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. *People v. Furby*, 138 Ill. 2d 434, 455, 563 N.E.2d 421, 430 (1990).

### B. Discussion

■ "A person commits residential burglary who knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." 720 ILCS 5/19—3(a) (West 2000).

■ No individual who is granted access to a dwelling can be said to be an authorized entrant if he intends to commit criminal acts therein, because, if such intentions had been communicated to the owner at the time of entry, it would have resulted in the individual's being barred from the premises *ab initio. People v. Bush*, 157 Ill. 2d 248,

253-54, 623 N.E.2d 1361, 1364 (1993). The determination of whether an entry is unauthorized depends upon whether the defendant possessed the intent to perform a criminal act therein at the time entry was granted. *Bush*, 157 Ill. 2d at 254, 623 N.E.2d at 1364. If the defendant gains access to the victim's residence through trickery and deceit and with the intent to commit criminal acts, his entry is unauthorized and the consent given vitiated because the true purpose for the entry exceeded the limited authorization granted. *Bush*, 157 Ill. 2d at 254, 623 N.E.2d at 1364. Conversely, where the defendant enters with an innocent intent, his entry is authorized, and criminal actions thereafter engaged in by the defendant do not change the status of the entry. *Bush*, 157 Ill. 2d at 254, 623 N.E.2d at 1364.

In this case, there was no direct evidence that the defendant intended to commit a theft or felony when he entered Mr. Carter's apartment. The defendant argues that Officer Docherty's stipulated testimony that Mr. Carter told him that the defendant and he engaged in some friendly name-calling and that the defendant asked him for a loan before taking the LINK card establishes that the defendant did not intend to rob Mr. Carter when the defendant initially entered Mr. Carter's apartment. We disagree.

According to Mr. Carter's testimony at trial, believing that the defendant and he were going to play chess, Mr. Carter retrieved his chess set only to find the defendant pointing a gun at him and demanding his LINK card.

When a defendant challenges the sufficiency of the evidence supporting his conviction, the court asks whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty of the essential elements of the crime beyond a reasonable doubt. *People v. Hernandez*, 312 Ill. App. 3d 1032, 1036, 729 N.E.2d 65, 68 (2000). A criminal conviction cannot stand on appeal if the prosecution's evidence is so weak as to create a reasonable doubt of the defendant's guilt. *Hernandez*, 312 Ill. App. 3d at 1036, 729 N.E.2d at 68.

We are aware, as the court in *Hernandez* cautioned, that our deference to trial judges in matters of credibility should not serve to rubber stamp bench trial findings of guilty in place of a careful consideration of the evidence. See *Hernandez*, 312 Ill. App. 3d at 1037, 729 N.E.2d at 68-69. In *Hernandez*, the court reversed the defendant's conviction even though the trial court had found the sole eyewitness's identification of the defendant to be credible. The reviewing court determined that the eyewitness's testimony was not reliable because of the lack of opportunity for the eyewitness to view the defendant and the witness's own uncertainty in making the identification.

In the present case, while contradicted by Officer Docherty's stipulated testimony, if Mr. Carter's trial testimony is believed, when the defendant entered Mr. Carter's apartment, armed with a weapon, he intended to rob Mr. Carter of Mr. Carter's LINK card. In contrast, in *Hernandez*, the eyewitness's own testimony created the doubt in his identification of the defendant.

The defendant's reliance on *People v. Hamilton*, 179 Ill. 2d 319, 688 N.E.2d 1166 (1997), is misplaced. The issue in that case was whether the defendant, who was charged with residential burglary, was entitled to a jury instruction on the lesser included offense of theft. The supreme court concluded, *inter alia*, that because there was evidence from which the jury could have concluded that the defendant did not formulate the intent to commit a theft until after he was admitted to the victim's house, the defendant was entitled to the theft instruction at his new trial. *Hamilton*, 179 Ill. 2d at 328, 688 N.E.2d at 1171.

The *Hamilton* court did not conclude, however, that the defendant could *not* be convicted of residential burglary based on those facts, which is the question in the case before us. The court merely determined that the jury should be given that choice.

■ In this case, the trial court, having considered the evidence and the credibility of the witnesses, concluded that the evidence had proved the defendant guilty of the residential burglary charge beyond a reasonable doubt.

Determinations of the credibility of the witnesses, the weight to be given to their testimony and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact. *Furby*, 138 Ill. App. 3d at 455, 563 N.E.2d at 430. As we will not substitute our judgment for that of the trial court in matters of credibility, we conclude that the defendant was proved guilty of residential burglary beyond a reasonable doubt.

## II. Robbery Conviction

The defendant contends that the trial court's findings that he was guilty of robbery but not guilty of armed robbery are legally inconsistent and, therefore, his conviction for robbery must be reversed. The defendant reasons that the trial court's findings are legally inconsistent because the only evidence of force or threat of force was the gun, the absence of which the trial court used to find the defendant guilty of robbery rather than armed robbery. We disagree.

First, even without the gun, the defendant's words to Mr. Carter, "I'm not playing no M.F. games, I'm sick," along with the testimony that the defendant needed "dog food" or heroin, was sufficient for Mr.

Carter to perceive a threat of force if he did not accede to the defendant's wishes. Therefore, there was sufficient evidence, without the presence of the gun, to support the defendant's conviction of robbery.

In any event, we are of the opinion there is no legal inconsistency in the trial court's findings in this case.

■ Illinois cases recognize two types of inconsistency: logical inconsistency and legal inconsistency. *People v. Rhoden*, 299 Ill. App. 3d 951, 957, 702 N.E.2d 209, 213 (1998). Verdicts are logically inconsistent if they " 'acquit and convict a defendant of crimes composed of different elements, but arising out of the same set of facts.' " *Rhoden*, 299 Ill. App. 3d at 957, 702 N.E.2d at 213, quoting *People v. Klingenberg*, 172 Ill. 2d 270, 274, 665 N.E.2d 1370, 1373 (1996). Verdicts are legally inconsistent if they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist. *Rhoden*, 299 Ill. App. 3d at 957, 702 N.E.2d at 213.

■ Verdicts acquitting a defendant of the predicate offense and convicting him of the compound offense are legally inconsistent, and the conviction for the compound offense must be reversed. *Klingenberg*, 172 Ill. 2d at 275, 665 N.E.2d at 1373 (verdicts acquitting the defendant of theft but convicting him of official misconduct, which was based on the theft, were legally inconsistent). On the other hand, verdicts convicting a defendant of the predicate offense and acquitting him of the compound offense, if inconsistent, are only logically inconsistent and may stand. *Klingenberg*, 172 Ill. 2d at 275, 665 N.E.2d at 1373.

■ In the present case, the defendant was acquitted of the compound offense, armed robbery, but convicted of the predicate offense, robbery.

The trial court referred to the fact that the gun was not recovered, not that it was not used to take Mr. Carter's LINK card. The trial court found the defendant guilty of the predicate offense, not the compound offense, and therefore the findings are logically, not legally, inconsistent.

We conclude that the trial court's finding of guilty as to robbery and not guilty as to armed robbery in this case are logically rather than legally inconsistent, and therefore, the defendant is not entitled to reversal of his robbery conviction.

### III. Defendant's Sentence

■ The defendant contends that his sentence must be reduced because the value of the LINK card was less than $300.

However, as the State points out, the defendant's argument is based on his contention that he should have been convicted of theft rather than robbery. Unlike a conviction for theft where the penalty is impacted by the value of the property taken, the value of the property taken does not impact the penalty in the case of residential burglary or robbery, the convictions that we have upheld. See 720 ILCS 5/16—1, 18—1, 19—3 (West 2000).

Therefore, we conclude that the defendant is not entitled to a reduction in his sentence.

The defendant's convictions and sentences are affirmed.

Affirmed.

SOUTH, P.J., and HOFFMAN, J., concur.