2024 IL App (1st) 220848-U

FIFTH DIVISION
MARCH 15, 2024

No. 1-22-0848

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 12862 |
| | ) | |
| TRAVELL TAYLOR, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

ORDER

¶ 1   *Held*:   We affirm defendant's conviction of first-degree murder where the trial court's failure to properly admonish the jury under Illinois Supreme Court Rule 431(b) did not constitute plain error.

¶ 2   The State charged the defendant-appellant, Travell Taylor, by indictment with first degree murder, attempted murder, and aggravated discharge of a firearm. The circuit court conducted a jury trial of Mr. Taylor on the aforementioned charges. At the conclusion of the trial, the jury found Mr. Taylor guilty of first-degree murder, and that in committing first degree murder, he had personally discharged a firearm, proximately causing death. Mr. Taylor was sentenced to 50 years'

imprisonment. On appeal, Mr. Taylor argues that he was denied a fair trial because the trial court failed to admonish the jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). For the reasons that follow, we affirm Mr. Taylor's conviction and sentence.

¶ 3 BACKGROUND

¶ 4 On August 5, 2016, the State charged Mr. Taylor by indictment with first degree murder of Johnathan Mills and attempted murder of Charles Banks. Mr. Taylor elected to proceed via a jury trial on the charges. On April 30, 2018, the trial court conducted *voir dire*. Before questioning the jury, the court gave admonishments regarding the essential principles of a criminal trial as set forth in Supreme Court Rule 431(b). The court explained that anyone placed on trial in a criminal case has a right to testify on their own behalf and that if Mr. Taylor chose to testify, the jury should judge his credibility like they would anyone else.

¶ 5 The court then stated that, "anybody placed on trial in a criminal case has a constitutional right not to testify; and if Mr. Taylor decides not to testify, no inference whatsoever can be true [*sic*] before reaching your verdict." No one in the venire raised their hands to indicate that they did not understand or accept this statement.

¶ 6 During the trial, the State called Chicago police detective Marc Leavitt. Detective Leavitt testified that he was assigned to investigate the shooting that occurred on July 25, 2016, and arrived on the scene after 2 p.m. the same day. The crime scene consisted of an intersection with a strip mall on the northeast corner with a couple of stores, including the Soap Opera Laundromat and Keeler Foods and Liquors. In the nearby parking lot, police officers observed eight expended shell casings, two fired bullets, a large pool of blood and a blood trail leading southwest through the parking lot to the body of Jonathan Mills.

¶ 7     Upon review of the crime scene, Detective Leavitt learned that Keeler Foods had surveillance cameras. He viewed the video from those cameras and observed the events leading up to and after the shooting. Detective Leavitt also discovered there was surveillance video at the Soap Opera Laundromat. He observed that Mr. Mills was accompanied by two other individuals at the time he was shot, and that they arrived in a gray Hyundai Sonata that was parked in the lot. One of the individuals was later identified as Charles Banks. Detective Leavitt searched the Hyundai Sonata and found nine baggies of what he suspected to be cannabis.

¶ 8     Detective Leavitt went to the laundromat and spoke to the manager, Silvia Cruz. He and Ms. Cruz watched the video together. She pointed out that the shooter from the video was doing laundry earlier that day. She also told him that the man left personal belongings in the laundromat and showed him a blue duffle bag. Detective Leavitt found that the bag contained several items, including a sealed envelope from the Illinois Department of Human Services (DHS). The envelope contained an application form with the name Travell C. Taylor. The letter was addressed to Mr. Taylor and contained a phone number.

¶ 9     After obtaining Mr. Taylor's name, Detective Leavitt searched for him in his computer system. He found a photograph of a man he believed to be Mr. Taylor and used this photograph to compile a photograph array containing six pictures. Ms. Cruz viewed the photograph array with the assistance of Detective Mike Kennedy, who acted as an independent administrator, and Officer Pedro Barrera, who acted as a Spanish translator. Ms. Cruz positively identified Mr. Taylor as the person pictured in the camera footage doing his laundry.

¶ 10    On July 28, 2016, Detective Leavitt, with the help of the Chicago Police Organized Crime Unit, tracked the phone number from the DHS letter to the 8000 block of South Normal Street.

Detective Leavitt found Mr. Taylor at that location and placed him in custody. During a videotaped interview, Detective Leavitt showed Mr. Taylor still frames taken from the video footage from the scene, including a still of the shooter near the convenience store doorway approaching the victims. Mr. Taylor indicated that he was in the photograph and pointed himself out.

¶ 11    The Chicago Police Department downloaded approximately 16 hours of surveillance footage from the convenience store and the laundromat. These videos comprised of four discs, and they were admitted into evidence at People's Exhibit 5. A compilation video taken from the four discs was admitted into evidence as People's Exhibit 9. The State played People's Exhibit 9 and asked Detective Leavitt to walk the jury through the video as it played.

¶ 12    The surveillance video begins with footage from inside the laundromat at 11 a.m. A man wearing a white tank top, jeans, and long dreadlocks is shown inside the laundromat. The man walks over to a set of washers and places a blue duffle bag on the table. He has a brief conversation with Ms. Cruz by the washers, then continues to put things into the washers.

¶ 13    The video changes to a camera view from inside and outside Keeler Foods, showing the area immediately outside the convenience store, including the nearby sidewalk and parking lot. A gray car enters the parking lot and reverses into a space to park. Three men exit the car and walk inside Keeler Foods. Mr. Mills is identified by Detective Leavitt as one of the men exiting the car. The video then shows Mr. Mills and Mr. Taylor in the store, for a brief period, at the same time.

¶ 14    Later, the same gray car pulls back into the parking lot and reverses into the same spot. The three men again exit the gray car and walk into the convenience store. The video then cuts to footage showing Mr. Taylor on his phone in the laundromat, walking toward the door. He exits the laundromat, makes a right, and walks to the north away from the strip mall.

¶ 15 The video shifts to show Mr. Mills and his two friends exiting Keeler Foods and walking into the laundromat. The men remain in the laundromat for a few minutes then are shown leaving the laundromat and walking into the parking lot. Mr. Taylor is shown walking west on the sidewalk, past the convenience store, then into the parking lot toward the three men. Mr. Taylor outstretches his right arm toward the three men. Mr. Mills falls to the ground, while one man runs to the right, and the other to the left.

¶ 16 Ms. Cruz testified that she worked at the Soap Opera Laundromat. She stated that Mr. Taylor comes into the laundromat nearly every day. On the day of the shooting, she spoke to Mr. Taylor, and he helped her adjust the television. During her testimony, she identified Mr. Taylor as the person she was talking to and that helped her fix the television. She testified that she did not see Mr. Taylor with a gun or see the shooting take place.

¶ 17 Mohammed Mohsen testified, with the assistance of an Arabic interpreter, that he worked at Keeler Foods at the scene of the shooting. He had been working at the store for five to six months. He identified Mr. Taylor as being present in the store that day. He saw Mr. Taylor in the store wearing a white tank top and jeans with a dreadlocks hairstyle. He also testified that he had seen Mr. Taylor previously and that Mr. Taylor came into the store approximately two to three times a day.

¶ 18 At approximately 1:25 p.m., Mr. Mohsen was getting ready for prayer when he heard three to four gunshots. He ran to the front of the store and saw Mr. Mills pulling himself to the edge of the parking lot. He then called 911. When police officers arrived at the store, Mr. Mohsen showed them the camera footage from the store, and they watched it together. He was shown a photo array and identified Mr. Taylor as the "killer."

¶ 19    Mr. Banks testified that he knew Mr. Mills from his neighborhood and had known him for two years. On the day of the shooting, Mr. Mills picked him up between 8 and 8:30 a.m. The two drove around and smoked cannabis. Mr. Mills drove them to the strip mall at South Keeler Avenue and West Roosevelt Road and went into the convenience store. While in the store, Mr. Banks saw someone he had seen before, but did not know his name. That person asked him where he got his weed, but Mr. Banks did not answer. He did not remember hearing that person ask Mr. Mills anything.

¶ 20    Mr. Banks and Mr. Mills then left the area and continued driving around, smoking cannabis, and, at some point, picked up a third person he knew as Deangelo. The group went back to the strip mall around 1 p.m. They first went to the convenience store to purchase packaged cigars, then went to the laundromat. Mr. Mills did not know why they went in, as no one had any laundry. On the way back to the car, Mr. Mills paused to show Mr. Banks something on his phone. While stopped, Mr. Banks heard a man's voice say, "you don't [*sic*] supposed to be right here" and then heard five to six gunshots. He and Mr. Mills ran, with Mr. Banks running north and leaving the area. Mr. Banks returned about 20 to 30 minutes later and saw Mr. Mills lying on the ground. On July 27, 2016, the police came and took Mr. Banks to the police station. At the station, the police showed Mr. Banks a photograph array. He identified Mr. Taylor as the person he saw at the store.

¶ 21    After the close of the trial evidence, the jury found Mr. Taylor guilty of the first-degree murder of Mr. Mills, but not guilty of the attempted murder of Mr. Banks. Mr. Taylor filed a posttrial motion, arguing that the State failed to prove him guilty beyond a reasonable doubt and that the trial court erred in denying his pretrial motion to suppress his statements to Detective

Leavitt. The trial court denied this motion. On June 12, 2018, the trial court sentenced Mr. Taylor to 50 years' imprisonment. Mr. Taylor filed his notice of appeal on June 21, 2018.

¶ 22                                    ANALYSIS

¶ 23    We note that we have jurisdiction to consider this matter, as the Illinois Supreme Court issued a supervisory order directing this Court to treat Mr. Taylor's prematurely filed notice of appeal as a properly perfected appeal from the final judgement. See Ill. S. Ct. R. 606 (eff. July 1, 2017); see also *People v. English*, 2023 IL 128077, ¶ 25.

¶ 24    Mr. Taylor's opening brief raised the issue that the jury was not sworn in by the trial court, which constitutes reversible structural error. However, this argument was abandoned in his reply brief after the supplemental argument was filed. Thus, we will only address Mr. Taylor's remaining issue.

¶ 25    Mr. Taylor argues that he was denied a fair trial because the trial court misstated the fourth principle outlined in Illinois Supreme Court Rule 431(b) in a closely balanced case in which he did not testify. He argues that because the State heavily relied on the eyewitness testimony of individuals who did not personally witness the shooting, a reasonable juror could have found Taylor not guilty. We note that this issue was not raised during Mr. Taylor's trial, nor in his posttrial motion, he has failed to preserve it for appeal. *People v. Flores*, 2021 IL App (1st) 192219, ¶ 9. However, Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) permits correcting serious errors and errors in factually close cases. *People v. Ticey*, 2021 IL App (1st) 181002, ¶ 43.

¶ 26    "[T]he plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In

the first instance, the defendant must prove 'prejudicial error.' " *People v. Herron*, 215 Ill. 2d 167, 187 (2005). It is the defendant's burden to show both that "there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id.* For the second prong, "the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* To begin our analysis, we must first determine whether an error occurred. *People v. Thompson*, 225 Ill. 2d 551, 564 (2010). We review compliance with Rule 431(b) *de novo*. *Id.* at 606.

¶ 27 Illinois Supreme Court Rule 431(b) instructs the trial court to ask each potential juror, individually or as a group, whether that juror understands and accepts the following four principles: (i) the defendant is presumed innocent of the charge(s); (ii) before the defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt; (iii) the defendant is not required to offer any evidence on his or her own behalf; and (iv) the defendant's failure to testify cannot be held against them; "however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule "mandates a specific question and response process." *Ticey*, 2021 IL App (1st) 181002, ¶ 45. A trial court's failure to ask whether jurors understand each of the four principles constitutes error. *People v. Belknap*, 2014 IL 117094, ¶ 45.

¶ 28 Here, when questioning the jurors, the trial court stated, "anybody placed on trial in a criminal case has a constitutional right not to testify; and if Mr. Taylor decides not to testify, no inference whatsoever can be true before reaching your verdict." This statement is an erroneous departure from Rule 431(b)'s admonishment to jurors to not inquire into a defendant's decision

not to testify. The State also concedes that the trial court failed to adequately question the potential jurors regarding the fourth principle.

¶ 29    We agree with the parties, and, thus, turn to the two-prong plain error analysis. We first note that "[a] Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. Here, Mr. Taylor has not provided such evidence, nor made any argument under this prong. Therefore, we will focus on the trial evidence to determine whether it was closely balanced.

¶ 30    A "closely balanced" case is "one where the outcome of the case would have to be different had the impropriety not occurred." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 47 (quoting *People v. Pierce*, 262 Ill. App. 3d 859, 865 (1992)). This analysis requires an assessment of the evidence on the elements of the charged offenses, along with any evidence concerning the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53. Regarding witness credibility specifically, evidence can be considered closely balanced where each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. *Jackson*, 2019 IL App (1st) 161745, ¶ 47. A credibility contest does not exist when one party's version of events is unrefuted, implausible, or corroborated by other evidence. *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31. If a factfinder is required to assess the credibility of a witness where no rival witnesses or other competing evidence was presented, the evidence is not closely balanced. *People v. Hammonds*, 409 Ill. App. 3d 838, 861-62 (2011).

¶ 31    Here, the State presented video surveillance footage that captured the shooting. Both Ms. Cruz and Mr. Mohsen were shown those videos, still photographs from those videos, and a photograph array approximately an hour after the shooting. Though Mr. Mohsen and Ms. Cruz did

not see the shooting, they were able to identify Mr. Taylor as the shooter based on their interactions with him that day. Mr. Banks also identified Mr. Taylor as the man he saw in Keeler Foods the day of the shooting. The final identification came from Mr. Taylor through Detective Leavitt's testimony. Detective Leavitt testified that Mr. Taylor identified himself in the still photograph taken from the surveillance video moments before the shooting.

¶ 32    Mr. Taylor argues that this identification testimony lacks credibility because the eyewitnesses did not personally view the shooting and could not see the face of the man in the video moments before the shooting. He points to *People v. Hernandez*, 312 Ill. App. 3d 1032 (2000) as an analogous case. In *Hernandez*, a sole eyewitness had been watching two young men argue with another man for 10 minutes when a shooter momentarily exposed his profile to the witness. *Id.* at 1036. This witness told police he was unsure he would be able to identify anyone because he was looking at the backs of their heads. *Id.* at 1036-37. Additionally, the eyewitness identified the defendant in a lineup as the shooter three months after the shooting and after failing to identify him on two other occasions. *Id.* at 1037. This court found this testimony to be unreliable and, based on the totality of the circumstances, reversed the defendant's first-degree murder conviction. *Id.*

¶ 33    We do not find the facts in *Hernandez* to be applicable to this case. Though in both cases, the eyewitnesses did not see the shooter's face during the shooting, Ms. Cruz and Mr. Mohsen were able to view surveillance footage of the incident and identify the shooter as someone they have had contact with on numerous occasions. Additionally, in *Hernandez*, the eyewitness failed to identify the shooter twice before selecting him out of a lineup months after the incident. *Id.* Here, Ms. Cruz and Mr. Mohsen positively identified Mr. Taylor as the shooter within an hour of

the incident.

¶ 34    Instead, we find *People v. McCovins*, 2011 IL App (1st) 081805 more persuasive. In *McCovins*, the defendant was identified by two eyewitness accounts. *Id.* at ¶ 39. Though the shooting occurred when it was dark and the street was chaotic, the court found these witnesses to be reliable because they knew the defendant from the neighborhood and knew where he lived. *Id.* Additionally, the witnesses "immediately" named the defendant as the shooter when they were interviewed by police officers. *Id.* Further, the State presented another eyewitness who identified the defendant as the shooter. *Id.* Balancing the testimony of eyewitness with defendant's alibi witnesses, the court did not find that the evidence was closely balanced. *Id.*

¶ 35    Here, the witnesses may not have known Mr. Taylor's name, but they had numerous interactions with him. After Ms. Cruz viewed the footage of the shooting, she stated that she recognized the shooter as the person that helped her with her television that day. Though the shooter's face was not visible in the still photograph that was taken moments before the shooting, she was able to identify Mr. Taylor because she had seen him "almost every day" for the two to three months she had been working there. She also presented the blue duffle bag that she saw Mr. Taylor with to Detective Leavitt. The contents of this duffle bag led to Mr. Taylor's identification and arrest. Mr. Mohsen testified to seeing Mr. Taylor multiple times a day for the five to six months he had been employed at Keeler Foods. He also stated that he had seen Mr. Taylor the day of the shooting.  Importantly, Mr. Taylor did not present any competing evidence to refute the State's witnesses' testimony that he was at the scene of the shooting.

¶ 36    Viewing the evidence in its totality, we do not find that Mr. Taylor met his burden to show that the evidence was closely balanced. We note that while no physical or forensic evidence was

presented by the State, multiple witnesses positively identified him as the shooter from video evidence. Based on the facts presented at trial, we do not find that the evidence was so closely balanced that the trial court's error in questioning the jurors about their understanding and acceptance of Rule 431(b) constituted plain error.

¶ 37                                CONCLUSION

¶ 38    For the foregoing reasons, we affirm the judgement of the circuit court of Cook County.

¶ 39    Affirmed.