# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People v. McCovins*, 2011 IL App (1st) 081805-B

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYVON McCOVINS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-08-1805 |
| Filed | September 1, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for battery and aggravated battery with a firearm, defendant admitted that he failed to properly preserve his contention that the trial court erred during *voir dire* when it merely made a broad statement about the principles set forth in Supreme Court Rule 431(b) and then asked if the prospective jurors could "abide by" those principles, but did not ask whether they understood and accepted each principle, and although the trial court did err, the evidence was not closely balanced and the error did not constitute plain error under the first prong of plain error review. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-27316; the Hon. James M. Schreier, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Patricia Unsinn, Alan D. Goldberg, and David T. Harris, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Peggy Ann Gill-Curtin, Alan J. Spellberg, and Eve Reilly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.[*]
Justices Salone and Sterba concurred in the judgment and opinion.[**]

## OPINION

¶ 1    Following a jury trial, defendant Rayvon McCovins was convicted of one count of aggravated battery with a firearm and one count of simple battery. He was sentenced to concurrent terms of 8½ years and 364 days. On appeal, defendant contends his convictions should be reversed and his case remanded for a new trial because the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), which requires the trial court to question prospective jurors about their understanding and acceptance of the four principles set forth in the rule. The issue in the instant case is not whether a Rule 431(b) discussion occurred, but whether the inquiry satisfied Rule 431(b).

¶ 2    In an opinion filed on March 4, 2010, this court found that the trial court's methodology satisfied Rule 431(b) and upheld defendant's conviction. *People v. McCovins*, 399 Ill. App. 3d 323 (2010). Thereafter, on March 7, 2011, the Illinois Supreme Court issued a supervisory order directing this court to vacate its judgment and reconsider its prior ruling in light of *People v. Thompson*, 238 Ill. 2d 598 (2010). *People v. McCovins*, 239 Ill. 2d 574 (2011) (table). On March 23, 2011, this court granted defendant leave to file a supplemental brief. On reconsideration, we again affirm defendant's conviction.

---

[*]Following Justice Frossard's retirement, Justice Pucinski delivered the judgment of the court, with opinion. Justice Pucinski reviewed all relevant materials, including the court's original opinion filed on March 4, 2010, and the supervisory order issued by our supreme court on March 7, 2011.

[**]Pursuant to Justice O'Brien's retirement, Justice Salone has participated in the reconsideration of this case. Pursuant to Justice Gallagher's retirement, Justice Sterba has participated in the reconsideration of this case. Justice Salone and Justice Sterba have both reviewed all relevant materials, including the original opinion filed on March 4, 2010, and the supervisory order issued by our supreme court on March 7, 2011.

¶ 3                                    BACKGROUND

¶ 4        Defendant was charged with two counts of attempted first degree murder (720 ILCS 5/8-
4 (a), 9-1(a)(1) (West 2006)), two counts of aggravated battery with a firearm (720 ILCS
5/12-4.2 (West 2006)), and three counts of aggravated battery (720 ILCS 5/12-4(b)(8) (West
2006)) in connection to an October 31, 2006, shooting of Jasmine Powell and Brytnnie
Smith. The State nol-prossed the three aggravated battery counts and defendant elected to
proceed by way of jury trial on the remaining charges.

¶ 5        At trial, Jasmine Smith (Jasmine S.)[1] testified that on October 31, 2006, at approximately
6 p.m. she was in a candy store located on the corner of Homan Street and Huron Street with
her friends Jasmine Powell (Jasmine P.), Kiesha Johnson, Neisha Johnson and "Bobo," a
nine-year-old child. Jasmine Broxton, defendant's sister, was also in the store and threw an
egg at Keisha. In response, Neisha punched Broxton in the face. Neisha, Keisha, Jasmine P.,
and Bobo then "jumped on" Broxton. The fight was broken up by several boys who were at
the scene, one of whom, named "Smack," drove Broxton away from the store.

¶ 6        Jasmine S. and her friends left the store and began walking down Christiana Street
located nearby, and Nicole White, one of Jasmine S.'s friends, joined them. Defendant lived
on Christiana Street and Jasmine S. and her friends encountered him as they were walking
down the street. When White saw defendant, she swung a belt buckle at him. Bobo also
struck defendant. In response, defendant ran across the street and entered his residence.
Defendant exited his house shortly thereafter, holding a gun in his hands. When defendant
was approximately 20 feet away from Jasmine S. and her friends, he began shooting at them.
Jasmine S. ran away from defendant and heard him fire approximately nine shots. Jasmine
S. also heard Jasmine P. and Brytnnie Smith (Brytnnie S.) cry out as they were running down
the street.

¶ 7        Jasmine S. indicated that at the time of the shooting, she lived approximately one block
away from defendant and had known defendant for approximately one year.

¶ 8        Jasmine P. confirmed that on October 31, 2006, she participated in a fight involving
Jasmine Broxton, defendant's sister. After the fight, when Jasmine P. and her friends were
on Christiana Street, they were approached by defendant, who inquired about the altercation
involving his younger sister. When Jasmine P. "made a smart comment" in response to
defendant's inquiry, defendant revealed that he had a gun in the waistband of his pants. At
that time, a police car drove through the neighborhood and defendant ran off. When
defendant returned to Christiana Street, Nicole White confronted him about pulling a gun on
Jasmine P. and tried to hit him with a belt. Defendant ran off a second time. When he
returned, defendant began chasing Jasmine P. and her friends and shot at them. As she was
running away, Jasmine P. felt something go through her leg but she kept running until she
reached an alley. After defendant shot her in the leg, Jasmine P. was taken to John Stroger
Hospital to receive medical treatment. Her bone had been shattered and she stayed in the

_____

[1]A number of the State's female witnesses have the same first and/or last name. For the sake
of clarity, these witnesses will be referred to by their first name and the first letter of their last name.

hospital for approximately six days.

¶ 9     Brytnnie S. testified that at approximately 6:40 p.m. on October 31, 2006, she was "hanging around" with her friend Latoya Morgan on the 700 block of Christiana Street. She observed Jasmine S., Jasmine P. and Nicole White at that location. Defendant was outside across the street from his house, but retreated into his residence when some young boys threw bottles at him. Defendant then ran outside and started shooting. Brytnnie S. saw that defendant's arm was extended, but she did not remember seeing a gun in defendant's hands. She heard defendant fire approximately eight shots. Brytnnie S. began running north toward a nearby alley when defendant began shooting. As she was running, Brytnnie S. felt a "hard pounding" on the right side of her back. She almost fell, but was able to catch herself. When Brytnnie S. entered the alley, she saw Jasmine P. Jasmine P. had fallen to the ground and said that she had been shot in the leg. Police arrived at the scene and Brytnnie S. informed them that defendant had shot her. Brytnnie S. was then taken to Mount Sinai hospital. That evening, detectives assembled a photo array for Brytnnie S. to view and she was able to identify defendant as the shooter. Brytnnie S. had known defendant for approximately 10 years prior to the shooting.

¶ 10    On November 3, 2006, Brytnnie S. found a bullet in the lining of her coat. She called the police and they removed the bullet. On November 6, 2006, Brytnnie S. received a phone call from defendant. During the conversation, defendant asked her if she was okay and then indicated that he had not seen her in the crowd when he fired his weapon. Defendant informed Brytnnie S. that he would not have fired his gun if he had known that she was present.

¶ 11    Chicago police officer Brian Thomas testified that on October 31, 2006, at approximately 6:35 p.m., he and his partner received a dispatch over the radio about a shooting. In response, Officer Thomas and his partner drove to 745 North Christiana. At that location, Officer Smith encountered Jasmine P. and Brytnnie S. Jasmine P. had been shot in the leg and Brytnnie S. had a gunshot wound to her back. Officer Thomas conversed with the victims before they were transported to hospitals to receive medical treatment. Brytnnie S. and Jasmine P. both identified defendant as the shooter. Officer Thomas attempted to locate defendant that evening but he was not present at his house.

¶ 12    Detective Roland Rios testified that he and his partner, Jose Garcia, were assigned to investigate the shooting of Jasmine P. and Brytnnie S. Detective Rios conversed with Brytnnie S. in the emergency room at Mount Sinai hospital and she identified defendant as the shooter. After interviewing Brytnnie S., Detective Rios traveled to the scene of the shooting and attempted to interview possible witnesses to the shooting, but was unsuccessful. Detective Rios next interviewed Jasmine P. at Stroger Hospital. Jasmine P. also identified defendant as the man who shot her. Both Brytnnie S. and Jasmine P. used the name "Woods" to identify defendant. After conversing with the victims, Detective Rios generated a photo array, in which he included defendant's picture. Brytnnie S. viewed the photographs and identified defendant as the man who shot her.

¶ 13    Officer Orlando Velasquez testified that on November 3, 2006, he and his partner, Lester Wright, traveled to Brytnnie S.'s house located at 730 North Spaulding. When they arrived

at her residence, Brytnnie S. handed Officer Velasquez a black leather jacket and directed his attention to a hole in the top of her jacket. Officer Velasquez found a spent bullet in the lining of Brytnnie S.'s jacket. He subsequently recovered and inventoried the bullet.

¶ 14 Chicago police officer Brian Leclair testified that on November 8, 2006, at approximately 6 a.m., he and his partner traveled to 530 North Sawyer after receiving information that defendant was at that location. After entering the building, Officer Leclair went to the second floor and discovered defendant hiding in a closet under a pile of clothing. After ordering defendant out of the closet, Officer Leclair took defendant into custody. Following Officer Leclair's testimony, the State rested its case.

¶ 15 Misty Woods, defendant's sister, testified for the defense. On October 31, 2006, she was living with her family in a residence located at 718 North Christiana. At approximately 5:30 p.m., Woods heard the sound of glass windows cracking. Woods opened the front door, stepped out onto the porch and saw a crowd of 20 or 30 people outside. Woods then observed Jasmine P. throw a bottle at the window. Other people in the crowd then started throwing bottles and rocks at Woods' house and she retreated inside the residence.

¶ 16 Later that evening, another disturbance occurred outside of Woods' residence. This time, Woods observed approximately 40 to 50 people running north on Christiana Street. Woods' sister, Passion, said that the crowd was chasing their brother and then ran upstairs to call the police. Woods was inside the residence waiting for the police to arrive when she heard gunshots. Woods never saw her brother standing on the porch prior to hearing gunshots. Moreover, she never actually saw her brother being chased and did not know who fired the gunshots.

¶ 17 Passion Broxton, another one of defendant's three sisters, testified that on September 30, 2006, she had an altercation with Jasmine P. Some other girls were present and they also became involved in the fight. Police were called and Passion spoke to the officers about the incident. Passion indicated that she told defendant about the fight with Jasmine P. and acknowledged that he "wasn't happy" about the altercation.

¶ 18 Tamara Duncan, defendant's girlfriend, testified that on October 31, 2006, at approximately 5:30 p.m. she and defendant left his residence located at 718 North Christiana and walked to her residence located nearby at 530 North Sawyer. When they arrived at Duncan's house, she and defendant sat on the front porch for approximately 30 minutes until defendant left to return to his house, where he was meeting someone else. Defendant returned to Duncan's house approximately 10 or 15 minutes after he had left. He had a T-shirt wrapped around his head and informed Duncan that he had gotten hit in the head with a bottle. Defendant's head was bleeding and Duncan cleaned the wound and put some gauze on the injury. Defendant stayed at Duncan's house the rest of the evening and did not leave until the following morning.

¶ 19 Carla Duncan, Tamara's mother, confirmed that defendant was at her house with her daughter at approximately 6:15 p.m. on October 31, 2006. Defendant had been hit in the head with a bottle and Tamara was tending to defendant's injury. Carla went to bed at approximately 11:30 p.m. that evening and defendant was still in her house at that time. At approximately 6 a.m. on November 8, 2006, police arrived at Carla's home. Police informed

her that there was a fire on the first floor of the residence. The officers then entered the apartment and arrested defendant. Police coerced Carla into signing a complaint for criminal trespass against defendant because they told her she would be arrested for harboring a fugitive if she did not comply. Carla indicated that defendant always had permission to be at her house.

¶ 20    Tommy Walker, defendant's cousin, testified that he spoke to Brytnnie S., his ex-girlfriend with whom he had a child, about the shooting. Walker had just visited defendant in jail and was upset. Walker asked Brytnnie S. if she was sure that defendant was the person who shot her and Brytnnie S. admitted that she was not certain. Walker asked Brytnnie S. why she blamed defendant for the shooting if she was not certain that he was the offender and she said that the shots had come from the direction of defendant's residence and that people in the crowd had said defendant was the shooter. Walker acknowledged that he did not want defendant to be in trouble and that he was a convicted felon.

¶ 21    The parties then proceeded by way of stipulation. The parties first stipulated that if Detective Carney was called to testify, he would state that he interviewed Jasmine S. on November 8, 2006. She informed him that Jasmine Broxton had been hit with an egg. Jasmine S. also indicated that she had never seen a gun that evening.

¶ 22    The parties further stipulated that if Amy Martarono, a dispatcher at the Chicago police department's 911 center, were called to testify, she would state that a call was received at 6:28 p.m. on October 31, 2006, regarding a man that had been stabbed at the corner of Homan and Huron Streets. The caller also stated that there were approximately 100 kids on the street at the 700 block of North Christiana Street. The caller reported that the mob was throwing bottles and there was a female participant who had a knife. Martarono would further testify that at 6:19 p.m. a call was received from 657 North Christiana and the caller said that there were hundreds of kids fighting on the street with sticks, bricks and golf clubs. The kids were breaking house and car windows. Another 911 call was received at 6:20 p.m. from the 700 block of North Christiana about kids fighting and throwing bricks in the street. A call placed at 6:33 p.m. from 614 North Christiana indicated that there were 13 people fighting on the street with bats, knives, and bottles. Finally, a call placed at 6:37 p.m. from a cell phone somewhere in the 700 block of North Christiana indicated that shots had been fired.

¶ 23    Next, the parties stipulated that Detective Gerald Swinkle would testify that he interviewed Carla Duncan on November 9, 2006. Duncan admitted that she was unsure when defendant was at her residence on October 31, 2006, but indicated that her daughter informed her that defendant arrived at approximately 5:30 p.m.

¶ 24    Following the stipulations, the parties delivered closing arguments. The jury returned with a verdict, finding defendant guilty of aggravated battery with a firearm of Jasmine P. and Brytnnie S. and not guilty of the first degree murder charges. Upon posttrial motion, the court found insufficient evidence of injury or bodily harm to Brytnnie S. and entered a conviction for the lesser included offense of simple battery. The trial court sentenced defendant to 8½ years in the Illinois Department of Corrections for aggravated battery of Jasmine P. concurrent with 364 days for the battery of Brytnnie S. This appeal followed.

Defendant does not challenge the sufficiency of the evidence; rather, the only issue defendant raises on appeal is whether the trial court violated Rule 431(b).

¶ 25                                    ANALYSIS

¶ 26    In his supplemental brief, defendant, relying on *Thompson*, argues that the trial court erred when it provided a broad statement of applicable legal principles including the four Rule 431(b) principles during the *voir dire* process and failed to inquire into the potential jurors' acceptance and understanding of each of the principles. The trial court merely asked whether the *voir dire* members could "abide by" the legal principles it had listed and did not ascertain whether the potential jurors understood and accepted each of the four Rule 431(b) principles. Defendant acknowledges that he failed to properly preserve this issue on appeal, but he urges this court to review this matter for plain error. Defendant acknowledges that, pursuant to *Thompson*, a trial court's failure to comply with Rule 431(b) does not require reversal under the second prong of plain error review absent a showing of actual jury bias; however, he argues that the trial court's error warrants reversal in this case because the evidence against him was closely balanced and constituted plain error under the first prong of plain error review.

¶ 27    To properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). A defendant's failure to abide by both requirements results in forfeiture of appellate review of his claim. *Enoch*, 122 Ill. 2d at 186; *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). Here, it is undisputed that defendant failed to object to the trial court's purported Rule 431(b) violations at trial or in a posttrial motion, and accordingly, we find that forfeiture applies.

¶ 28    The plain error doctrine, however, provides a limited exception to the forfeiture rule. Ill. S. Ct. R. 615(a); *Bannister*, 232 Ill. 2d at 65. It permits review of otherwise improperly preserved issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair trial. Ill. S. Ct. R. 615(a); *Bannister*, 232 Ill. 2d at 65. The first step in any such analysis is to determine whether any error actually occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). If an error is discovered, the defendant then bears the burden of persuasion to show that the error prejudiced him under either prong. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009).

¶ 29    Defendant's claim of error concerns the trial court's compliance with a supreme court rule, which is subject to *de novo* review. *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007); *People v. Haynes*, 399 Ill. App. 3d 903 (2010). To determine whether an error occurred in this case, we examine amended Rule 431(b) as well as our supreme court's recent opinion interpreting the rule (*People v. Thompson*, 238 Ill. 2d 598 (2010)). Rule 431(b) provides:

        "The court *shall* ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt;

(3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to the specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 30　　　Here, the trial court commenced the *voir dire* process by making prefatory comments to the entire venire, informing them of the relevant legal principles that governed defendant's trial, including the four *Zehr* principles contained in Rule 431(b). Specifically, the court stated:

"THE COURT: Now, Jurors, I want to go over some basic fundamental principles of American constitutional and criminal law that will guide and direct and control our trial. I read to you the counts from the indictment. The indictment is a mere formal document which is necessary to place the defendant on trial. The indictment does not constitute any proof of guilt. It does not constitute any inference of guilt. Again, it's a mere formal document which is necessary to begin this trial.

Indeed, jurors, the defendant is presumed to be innocent of the charges against him in the indictment. This presumption of innocence is fundamental to our system. Every defendant charged with a crime in this country is presumed to be innocent thereof. The presumption of innocence rests with the defendant now. It remains with him throughout every stage of the trial and even at the close of the case during your deliberations. Presumption of innocence is not overcome unless and until the time aries when you are convinced beyond a reasonable doubt that he is guilty. That is the burden in this case, jurors, proof beyond a reasonable doubt. The burden of proof rests with the State. It never shifts to a defendant. A defendant may never be called upon to prove innocence.

* * *

The defense then may or may not choose to present a case. Again, the defense has no burden. If the defense decides to present a case, they may do so in the same form and fashion that the State did. If the defendant chooses to testify, then his testimony must be judged in the same manner as any other witness. If the defendant chooses not to testify, that in no way may be considered against him. The defense will rest their case."

¶ 31　　　The trial court further explained as follows:

"THE COURT: The Judge is the judge of the law and the jury must accept and apply the law as given to them by the Judge whether they like it or not, whether it fits into some preconceived opinion, but by their oaths the jury must accept and apply the law given to them by the Judge. The way the case is decided is for the jury to apply the law to the facts and in that way they decide the case.

* * *

-8-

Is there any juror who honestly, sincerely feels that they cannot abide by any or some or all of the principles I just talked about? Any juror who disputes it and feel that they cannot follow these constitutional principles? If so, please stand and tell me your name. Let the record show a negative response."

¶ 32 After the court made these preliminary comments and inquiries, the *voir dire* process commenced. The prospective jurors were questioned individually by the trial court and defense counsel about their backgrounds but were not questioned again about any controlling legal principles. Accordingly, the record establishes that the trial court admonished the potential jurors about each of the four Rule 431(b) principles and that the principles were discussed during the trial court's prefatory comments to the venire along with basic courtroom procedure and scheduling. After concluding these prefatory comments, the court then made a single inquiry, asking whether there was any juror who could not "abide by" or who "dispute[d]" "any or some or all of the principles."

¶ 33 Although defendant takes issue with the trial court's phraseology and argues that the trial court's inquiry did not track the precise language in the rule, reviewing courts have observed that Rule 431(b) "does not dictate a particular methodology for establishing the venire's understanding or acceptance of those principles" and have found that trial courts have met the requirements of the rule when they have utilized terminology that deviated slightly from the precise language contained in the rule. See, *e.g., People v. Digby*, 405 Ill. App. 3d 544, 548 (2010) (trial court's questioning complied with Rule 431(b) when it inquired whether jurors " 'had a problem' " or " 'disagreed' " with the principles); *People v. Ingram*, 401 Ill. App. 3d 382, 393 (2010) (trial court complied with Rule 431(b) when it admonished the potential jurors of the four *Zehr* principles and inquired whether they had any " 'difficulty or quarrel' " with the principles). Here, we do not find that the trial court's phraseology constituted error. More problematic, however, is that the trial court essentially "collapsed" the four Rule 431(b) principles and included them into one question.

¶ 34 In our original disposition, we found that the trial court's inquiry was sufficient and observed that the plain language of Rule 431(b) did not require the trial court to question the jurors about each individual principle. On reconsideration, in light of *Thompson*, we find that the trial court's inquiry did not satisfy the requirements of Rule 431(b).

¶ 35 In *Thompson*, our supreme court found that the language of amended Rule 431(b) to be "clear and unambiguous." *Thompson*, 238 Ill. 2d at 607. The court explained:

"The rule states that the trial court 'shall ask' potential jurors whether they understand and accept the enumerated principles. While the prospective jurors may be questioned individually or in a group, the method of inquiry must '*provide each juror with an opportunity to respond to specific questions* concerning the [Rule 431(b)] principles.' The committee comments emphasize that *trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law*.' [Citation.]

Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either

individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." (Emphasis added.) *Thompson*, 238 Ill. 2d at 607.

¶ 36     Here, we find that the trial court failed to abide by the mandatory question and response process required by Rule 431(b). In contravention of Rule 431(b), the trial court merely provided the prospective jurors with a broad statement of legal principles interspersed with commentary on courtroom procedure and the trial schedule, and then concluded with a general question about the potential jurors' willingness to follow the law. Our supreme court's ruling in *Thompson* makes it clear that the court's inquiry was insufficient to ascertain whether the potential jurors understood and accepted each of the four Rule 431(b) principles.

¶ 37     Indeed, in *People v. Lampley*, 405 Ill. App. 3d 1 (2010), this court recently found that the trial court erred when it informed jurors of the four Rule 431(b) principles and then engaged in questioning that collapsed the principles. Specifically, the court inquired about the first three principles as follows: " 'the defendant is presumed innocent and does not have to offer any evidence on his own behalf but must be proven guilty beyond a reasonable doubt by the State. Does anyone here have any problems with those concepts? If so, please stand up?' " *Lampley*, 405 Ill. App. 3d at 3. The court then inquired about the final principle, asking: " 'As I have also previously stated, the defendant does not have to testify on his own behalf. If the defendant does not testify, you must not hold that decision against the defendant. If the defendant decides not to testify, is there anyone here who believes that, regardless of what I have just said, you would hold that decision against the defendant? If so, please stand up.' " *Id*. Ultimately, we found that the court's inquiry was insufficient pursuant to *Thompson*, explaining: "the trial court should have followed a straightforward questioning of the *Zehr* principles as outlined by Rule 431(b) and, as a result, committed error." *Id*. at 10-11. Here, as in *Lampley*, the trial court admonished the venire about the four *Zehr* principles, but its inquiry was even more deficient as it did not specifically refer to the four principles when it inquired whether the potential jurors could abide by all of the legal principles it had discussed in its prefatory comments. Accordingly, we find that the trial court erred. We do not, however, find that the error warrants reversal of defendant's conviction.

¶ 38     In *Thompson*, the court concluded that a Rule 431(b) error was not a structural error warranting automatic reversal of a defendant's conviction; rather, such an error is subject to plain error review. *Thompson*, 238 Ill. 2d at 608-15. Upon applying plain error review, the court concluded that a Rule 431(b) violation does not require reversal under the substantial rights prong of the plain error doctrine absent a showing of actual jury bias. *Thompson*, 238 Ill. 2d at 608-15. In light of *Thompson*, defendant, in his supplemental brief, does not present any evidence of actual bias or argue that his conviction should be reversed pursuant to the second prong of plain error review. Instead, defendant argues that the evidence against him was closely balanced and that the trial court's error constituted plain error under the first prong of plain error review. Defendant emphasizes that he presented two alibi witnesses and impeached the State's witnesses with prior comments made to police and civilians that they did not see the shooter. Moreover, defendant argues that "the scene of the offense was a street-wide brawl in the dark of night, hampering clear identification."

¶ 39     We disagree that the evidence against defendant was closely balanced. Brytnnie S. and Jasmine P. both identified defendant as the shooter. Although defendant emphasizes that it was dark and the street was chaotic at the time of the shooting, defendant was not a stranger to either girl. Both girls testified that they knew defendant from the neighborhood and knew the home where he and his family resided. The girls immediately named defendant as the perpetrator when they were interviewed by police officers. In addition to the testimony from the victims, the State also presented testimony from Jasmine S., an eyewitness to the shooting who identified defendant as the shooter. Although defendant emphasizes that he presented alibi testimony, we observe that his alibi witnesses included his girlfriend, Tamara Duncan, and his girlfriend's mother, Carla Duncan, both of whom shared a close relationship with defendant. See *People v. Mullen*, 313 Ill. App. 3d 718, 729 (2000) ("the trier of fact is not required to accept alibi testimony over positive identification of an accused, particularly where the alibi testimony is provided by biased witnesses"). Moreover, although Carla Duncan testified that defendant was at her residence at the time of the shooting, she admitted to Detective Swinkle that she was unsure when defendant arrived at her residence and that her daughter informed her that defendant arrived at approximately 5:30 p.m. and stayed with them the rest of the night. Based on the facts presented at trial, we do not find that the evidence was so closely balanced that the trial court's error in questioning the jurors about their understanding and acceptance of Rule 431(b) constituted plain error under the first prong of plain error review.

¶ 40                                        CONCLUSION

¶ 41     For the aforementioned reasons, we affirm the judgment of the trial court.

¶ 42     Affirmed.